178 P.2d 584

**STATE v. GODWIN.**

No. 4961.

Supreme Court of New Mexico.
March 20, 1947.

Claud S. Mann and Harold O. Waggoner, both of Albuquerque, for appellant.

C. C. McCulloh, Atty. Gen., and Robert W. Ward, Asst. Atty. Gen., for appellee.

SADLER, Justice.

The defendant appeals from a sentence of life imprisonment imposed by the district court of Valencia County following conviction before a jury of having on July 10, 1945, unlawfully and carnally known and abused Nan Bost, a female child three years and one month old in violation of 1941 Comp., § 41-3902.

On the date mentioned, at about 7:30 p. m., Nan Bost, three years and one month

old fled screaming from the rear door of the apartment of Mr. and Mrs. Robert B. Adams in Belen, New Mexico. She crossed a small court yard and went to the rear door of the apartment in which she lived with her father and mother, Mr. and Mrs. George V. Bost of Belen. The child's mother, attracted by her screams, went to the back door to meet and admit her. Immediately after getting inside, the child exclaimed: "That man hurt me" and when questioned by the mother informed her that it was a man over at the Adams' apartment wearing a white hat. Her condition was described by the mother as follows: "She was torn up physically, her hair was mussed, her clothes were off partially, both her legs were through one leg of her sun suit, she was holding the bib of her play suit."

The child was found to be bleeding at the vagina and there was blood on her lower stomach and legs. A medical examination conducted by two physicians within an hour following the injuries suffered disclosed that the child's labia was bruised and bleeding and that the hymen was ruptured.

As soon as Mrs. Bost had examined her daughter she crossed the small court yard and went to the rear door of the Adams' apartment. Receiving no response to a knock, nor to a call, and the rear door being open, she stepped from the outside through the screen door into the kitchen and called again but still got no response. The apartment seemed to be vacant. She then called a woman living nearby to come to her apartment. Together they took the child to the office of the physicians.

Less than an hour and a half prior to the time the child, Nan, ran screaming from the Adams' apartment in the condition described, the defendant had been left there in an apparent drunken stupor in a chair in the living room by Robert B. Adams, tenant of the apartment and Ray Borland. The defendant, Adams and Borland were all fellow employees of the Santa Fe Railroad Company which maintains a division point at Belen. The three had come to the apartment following a meeting on the street after visiting two bars and drinking for a time in each. The defendant already was in a drunken condition when Adams first met him on the street about midafternoon of that day. While in the latter of the two bars visited some woman came in and seated herself by defendant and remained between 40 and 45 minutes during which time he and she sat with their arms around each other, "loving each other, loving", as a witness described their actions. When she left the defendant inquired her address and on being told left his companions and was gone about 30 minutes.

It was while proceeding from the last bar visited by the trio to the Adams' apartment and just before arriving there that the group met George Bost, accompanied by his little daughter, Nan, en route to a grocery store to make a purchase. This was about

6:30 in the afternoon. Following the usual greetings, the defendant inquired of Bost if the child was his daughter and upon being told that she was responded that he didn't know Bost had a daughter.

It was Adams' intention, upon leaving the first bar visited with defendant to take him to the Kuhn hotel where defendant lived but he refused to give them his room number. Accordingly, after the trio visited the second bar they took him to the Adams' apartment. Adams had just quit work when he met defendant, so he conceived the idea of going home to wash up when all three would go up town to eat at some restaurant. However, when they attempted to arouse defendant from a drunken stupor into which he had fallen while seated in the chair in the living room of the apartment, he gave no reaction, even to an application of face towels dipped in ice water. The other two then proceeded up town without him.

They first went to a drug store to get some sandwiches. While still there, George Bost, the father of Nan came to the store looking for defendant. Adams left the store with Bost and one Sid Smith who had been encountered in the meantime and went directly to the Kuhn hotel where they found defendant. They took him with them to the doctors' office. When first contacted at the hotel, the defendant said: "Hello Bob, hello Sid, what is going on", or something to that effect. Adams replied that he, the defend-

ant, was in trouble. The defendant made no response to this statement.

When they reached the doctors' office, they parked their car directly in front of it. They met the child's mother and others, who had accompanied her there coming out of the doctors' office, Frank Mauldin, a neighbor, carrying Nan in his arms. Bost, Nan's father, Godwin, the defendant, and Adams walked toward the party and when only a short distance away the father, without doing anything to indicate the defendant, said to his daughter: "Is this the man?" Nan, pointing directly to defendant, said: "Yes, Daddy, that is the man." The accused made no response but "dropped his head and changed color", as one witness described it. Whereupon, the father of the child struck defendant on the head and in the face with his fist, knocking him down and kicking him two or three times while on the ground. It was about 8:00 p. m. when this happened.

Just as one of the examining physicians, Dr. Parkinson, was about to leave in his car, following his examination of the child, he was called by Mauldin and asked to return to his office to examine the defendant. The latter had been knocked out momentarily but was picked up, taken inside and placed on a table in the doctor's office. Regaining consciousness, he wanted to know what had happened and was told by the doctor to lie down; and that some one else would have to tell him about it. He lapsed

into unconsciousness again after the doctor had forced him back on the table for an examination—either unconsciousness or a stupor from the inebriated condition into which he had gotten himself earlier in the afternoon, it was difficult to say which, both the blows given him by Bost and the liquor probably contributing to his condition.

The doctor understood he was asked to examine defendant for the purpose of determining whether he had venereal disease. Hence, he made no special examination for the discovery of blood on his male organ or underwear. Actually, he observed none. There was fresh bleeding on his forehead and around the mouth from the blows struck by Bost, father of the child. The defendant's trousers were found to be unbuttoned all the way down in front, save for the top button holding them together. The male organ disclosed a slight redness on portions thereof that would have been irritated by sexual intercourse. This condition, however, could have been due to other causes and was in no way conclusive that defendant had engaged in recent sexual intercourse.

Following the visit to the doctors' office with her daughter, Mrs. Bost returned home and in the company of her husband and another visited the Adams' apartment looking for Nan's panties. They were found in one of the bedrooms, hanging on the side of the bed between the bed and the wall. The beds had been freshly made up within the week, Mrs. Adams having placed new bedspreads on them and the room was clean, not having been occupied for over a week with everything in an orderly condition. However, when examined after the child's flight from the apartment, as above related, one of the beds in this bedroom was "mussed up", with the pillow at the foot and the bedspread turned back toward the foot and Nan's panties hanging on the side of the bed toward the wall.

When and under what conditions the defendant left the Adams' apartment, no one knows. He was not seen to leave by any person, so far as known. It is quite possible that he was still in it when Mrs. Bost, Nan's mother, stepped inside the kitchen screen immediately after Nan ran from it, crying out: "That man hurt me." It was a four room plywood apartment. The accused could easily have been secreted in some part of it, but if so, he made no response to Mrs. Bost's effort to arouse some one. All known is that he appeared in the lobby of the Kuhn hotel about 8:00 p. m., where he was given a letter that had been received for him by Mrs. Mary Whittington, the proprietor. He read the letter and engaged in apparently normal conversation with her for a few minutes. The defendant was wearing a light colored straw hat on reaching the hotel. Shortly after his arrival, George Bost came in and they went out together, the defendant leaving his hat on a table in the lobby as well as the letter Mrs. Whit-

tington had given him. She reminded him that he was leaving the letter and asked if he wanted same. He asked her to keep it for him, saying he would return. Before Mr. Bost's arrival, the defendant also carried on a conversation with another guest of the hotel, a Mr. Beamis, discussing expenses met with in railroad work, the high cost of living and income taxes. This conversation was broken up by Mr. Bost's arrival, however, and he and the defendant left together going directly to the doctor's office where the events already related took place.

The defendant testified in his own behalf but did little more than to relate that he was so intoxicated that he remembered nothing that took place from about 5 o'clock in the afternoon on the day in question until he "came to" in the doctor's office later that evening. The verdict and sentence were as already indicated at the outset of this opinion. Hence, this appeal upon which defendant seeks a reversal and new trial.

All of the facts hereinabove related are well within the verdict of the jury returned against the defendant. Seeking a reversal, the defendant assigns two errors, to wit:

"I. The trial court erred in admitting testimony of third persons as to Nan Bost identifying the defendant when asked by her father, 'Is this the man'.

"II. The trial court erred in denying the motion for a directed verdict, at the close of the State's case, and renewed at the end of defendant's case, on the grounds of insufficient evidence of the corpus delicti, or of any penetration whatsoever of the penis of Appellant into the female organs of Nan Bost."

Did the trial court err in permitting witnesses to relate in evidence the statement made by Nan Bost upon having the accused brought into her presence, to wit: "This is the man"? This is the first question presented for decision. After the opening statement by the state and the district attorney's announcement that the state would tender as its first witness the child claimed to have been abused by the defendant, counsel for defendant invoked a ruling by the court on whether the child's tender years and the lapse of time did not deny her the competency to testify. Holding that a child three years and one month old could not be expected to remember events occurring several months earlier nor to understand the nature or obligation of an oath, the court ruled her incompetent as a witness.

Thereupon and in the course of the trial the court permitted witnesses to testify over an objection which we shall hold goes to the hearsay character of the testimony that the accused was the person who hurt her, saying: "This (the defendant) is the man."

The attorney general, while admitting the hearsay character of the testimony objected to, defends its admission on the ground that it comes within the res gestae exception to the hearsay rule. The principle involved is that an utterance made impulsively and under the immediate influence of a terrifying occurrence may be so inherently truthful that the ordinary sanctions and tests applied to assure verity may be dispensed with. A spontaneous exclamation uttered under such circumstances is illustrative. The test, as quoted with approval by the court from Wigmore in State v. Buck, 33 N.M. 334, 266 P. 917, 918, is as follows:

"First. 'There must be some shock, startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting.'

"Second. 'The utterance must have been before there has been time to contrive and misrepresent, i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.'

"Third. 'The utterance must relate to the circumstances of the occurrence preceding it.'"

Other cases in which we have dealt with the question of spontaneous exclamations which we believe support the trial court's action in admitting the child's statement here, are State v. Stewart, 34 N.M. 65, 277 P. 22; State v. Raulie, 35 N.M. 135, 290 P. 789; State v. Sanford, 44 N.M. 66, 97 P.2d 915; State v. Beal, 48 N.M. 84, 146 P.2d 175.

These decisions lay down no hard and fast rule of admissibility but determine same by the special circumstances of each case. It is apparent from them that the element of spontaneity is not to be determined by time alone. It is sufficient for the statement to be substantially contemporaneous with the shocked condition, but not necessarily with the startling occurrence. And in line with the weight of authority we held in State v. Fernandez, 37 N.M. 151, 19 P.2d 1048, that although the statement is in answer to a question, it is admissible. See Dallas Railway & Termial Co. v. Burns, 1933, Tex.Civ.App., 60 S.W.2d 801, 802, where the court said: "If it is otherwise within the rule, it is not rendered inadmissible simply because it is made in response to a question."

Counsel for the state urge that as to this sort of evidence much must be left to the discretion of the court in admitting or rejecting such testimony, citing State v. Buck, supra, wherein we quoted Wigmore as saying of the task of reviewing courts in such cases: "They should, if they are able, lift themselves sensibly to the even greater height of leaving the application of the principle absolutely to the determination of the trial court."

It has been asserted in some decisions that the trial court must exercise an unusual amount of discretion due to its better position in determining whether the statement is spontaneous. See Chicago, R. I. & P. R. v. Owens, 1920, 78 Okl. 50, 186 P. 1092, certiorari denied, 1920, 253 U.S. 489, 40 S.Ct. 485, 64 L.Ed. 1027; Smith v. Chicago, R. I. & P. R., 1914, 42 Okl. 577, 142 P. 398; Dorr v. Atlantic Shore Ry., 1911, 76 N.H. 160, 80 A. 336.

The appellant argues from a number of circumstances that the statement of Nan Bost as to the identity of her assailant is unreliable. But we think the admissibility of this sort of evidence is not affected by the court's opinion as to how much weight should be given to it. The credit of the maker of the statement and the weight to be given thereto were naturally proper elements for consideration by the jury.

The trial court proceeded with unusual and highly commendable caution in determining the admissibility of this testimony. We hold there was no error in admitting it. The first claim of error must be denied.

We turn next to the defendant's second claim of error, namely, that the verdict is without substantial support in the evidence. The argument resolves itself very largely into the contention that the state failed to establish the corpus delicti by failing in proof of penetration. That a finding of this fact was essential to conviction of the crime charged goes without saying. But it is not necessary that it be proved by direct evidence. Indeed, in the case of a child of tender years, such as the victim here, this often would prove quite impossible. The fact may be shown by circumstantial as well as direct evidence. 52 C.J. 1091, § 124 under "Rape"; 44 Am. Jur. 965, § 100 under "Rape"; Case note in 80 Am.Dec. 361; State v. Hamilton, 304 Mo. 19, 263 S.W. 127. In Am.Dec., supra, the author of the case note says: "It is not indispensable that the penetration be proved by the testimony of the prosecutrix; it may be established by circumstantial evidence; see Regina v. Lines, 1 Car. & K. 393; State v. Hodges, Phill.L. 331, overruling State v. Gray, 8 Jones 170; State v. Tarr, 28 Iowa 397; Brauer v. State, 25 Wis. 413."

The defendant was alone in the apartment from which the child fled screaming for all or some portion of the hour or more preceding the child's departure. That he was in a passionate mood during this period and for some time prior thereto, a condition contributed to no doubt by the liquor consumed from midafternoon on, is established by his conduct with the woman in a bar shortly before going to the apartment. It would be pure speculation to suppose that another may have entered the apartment after defendant left

it and have committed the offense. It is equally so, we feel, to ponder whether the defendant, contrary to nature, (a suggestion advanced by his counsel) may have penetrated the female organ of the child with his finger, even if there were no circumstances suggesting that he did it otherwise, such as being found 30 minutes after discovery of the crime with the foreskin of his penis irritated and reddened and his trousers unbuttoned, save for the top button holding them up. The opportunity plus physical condition of the victim, in the light of attendant circumstances, may furnish adequate proof of carnal knowledge. See Commonwealth v. Hollis, 170 Mass. 433, 49 N.E. 632, 633, where the court said: "Under ordinary circumstances, such evidence would be sufficient, and it was for the jury to determine how far the inference of guilt was weakened by the other facts relied on." See, also, Wair v. State, 133 Tex.Cr.R. 26, 106 S.W.2d 704. In this case the majority held proof of penetration by the accused's male organ was insufficient. But there was direct evidence of penetration by another object, a kind of testimony that is lacking here. Aside from this, the minority opinion impresses us as giving a sounder appraisal of the facts. Here, as in the Hollis case, supra, it was for the jury to say to what extent the incriminating circumstances relied upon by the state were weakened by contrary characterizations, more or less plausible, or by other facts having an opposite tendency in the evidence.

The jury evidently was not impressed by the defendant's testimony that he remembered nothing from about 5:00 p. m. until he regained consciousness while lying on a table in the doctor's office at 8:00 p. m., especially in view of the fact that he was overheard carrying on a fairly intelligent conversation on the expenses incident to railroad work, the high cost of living and income taxes within the half hour prior to reaching the doctor's office as well as a routine conversation with the lady manager of his hotel.

We are not unmindful of the great caution that must be exercised by the reviewing court in dealing with sex crimes, to guard against danger that the very heinousness of the offense charged may influence a verdict not supported by the evidence. See State v. Paiz, 34 N.M. 108, 277 P. 966. This consideration has caused us to scrutinize the evidence with great care and while here as in many cases where the extreme penalty of death or life imprisonment is imposed, the reviewing court finishes its review of the evidence with regret that clearer and more definite proof could not have been produced; nevertheless, mindful that most of these cases depend for convictions upon circumstantial evidence, our task is done when we find the evidence attains the degree of substantiality. We hold that it has done so here.

Accordingly, the judgment of the district court will be affirmed and it is so ordered.

BRICE, C. J., and LUJAN, and McGHEE, JJ., concur.