## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2010-NMSC-002**

**Filing Date: January 5, 2010**

**Docket No. 29,650**

**STATE OF NEW MEXICO**,

      **Plaintiff-Appellee,**

**v.**

**JOSEPH FLORES**,

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jay W. Forbes, District Judge**

McGarry Law Office
Kathleen McGarry
Glorieta, NM

for Appellant

Gary K. King, Attorney General
Ralph E. Trujillo, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**DANIELS, Justice.**

**{1}** Defendant Joseph Flores brings this direct appeal from his first-degree murder conviction for fatally stabbing his former lover, Vernon Green, twenty-one times with a Phillips screwdriver. We reject his arguments that the evidence was insufficient to support the jury's determinations that he was the killer and that he acted with the requisite deliberate intent to kill. We also determine that the trial court did not abuse its discretion by admitting: (1) evidence that after Green broke off the relationship with Defendant, Defendant contacted Green's ex-wife and claimed that Green was plotting to kidnap, rape, and kill their young

1

son; (2) testimony of Green's mother regarding Green's spontaneous verbal identification of Defendant when he unexpectedly saw Defendant in Carlsbad; and (3) an in-court identification of Defendant by an eyewitness who had seen his photograph after having seen him personally several times at the scene of the crime, both before and during the day of the killing. Finding no error, we affirm his conviction and life sentence.

## I.    SUFFICIENCY OF THE EVIDENCE

### A.    Standard of Review

**{2}**    Our substantial evidence review of the sufficiency of the evidence to support a conviction must take into account both the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted); *see State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661. "Substantial evidence is defined as that evidence which is acceptable to a reasonable mind as adequate support for a conclusion." *State v. Robinson*, 94 N.M. 693, 696, 616 P.2d 406, 409 (1980). Furthermore, "we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

**{3}**    "In our determination of the sufficiency of the evidence, we are required to ensure that a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Duran*, 2006-NMSC-035, ¶ 5 (internal quotation marks and citation omitted). This determination

> does not involve substituting the appellate court's judgment for that of the jury . . . , but it does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction.

*State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). With those guidelines in mind, we address Defendant's challenges to the sufficiency of the evidence to support a rational jury's determinations that he killed Green and that he did so with the deliberate intent required for a first-degree murder conviction.

### B.    The Relevant Evidence

**{4}**    The State's evidence showed that Defendant and Green had previously been living

2

together as lovers in Las Vegas, Nevada.  Approximately two weeks before the stabbing, Green left Defendant and moved to Carlsbad to live with his parents.  Green enrolled for an alcohol server certification class at the Carlsbad Quality Inn, where the crime ultimately took place.

**{5}**     Shortly after Green left Las Vegas, Defendant made fifteen or more phone calls to Green's ex-wife.  Defendant reported to Green's ex-wife not only that Green had left him, but also that Green intended to hide and hurt their young son "in many ways that should never happen to a child."  Defendant also faxed to her what he claimed were pages from Green's notebook depicting the abuse that Green purportedly was planning to inflict on his son.  The ex-wife called the Eddy County Sheriff's office and reported the calls, along with the phone number for Defendant which had been recorded by her telephone's caller identification.  A deputy sheriff called Defendant on September 13, 2004, eleven days before the September 24 killing of Green, and asked about his calls to Green's ex-wife.  Defendant repeated his claims about Green's plans to hurt his own son, telling the officer that Green planned to sodomize the boy, tie him up, kill him, and drop him by a river.  Defendant also claimed to the officer that he was married to Green, but that Green had been abusive to him.  He finally told the officer that he was planning to move to Houston, Texas.

**{6}**     The State's evidence also traced Defendant's movements in the days between the breakup and the stabbing of Green, which took place during the lunch break of the alcohol server class Green was attending on September 24.

**{7}**     Defendant's former employer, a sheet metal contractor in Las Vegas, testified that Defendant had approached him to get an advance on his salary, claiming that he had a son who had died in Arizona and that he needed $1200 to travel to New Mexico to bury him. In addition to advancing Defendant the $1200, the employer let Defendant use his credit card to rent a car in Las Vegas for the trip to New Mexico.

**{8}**     Green's mother testified that while she was driving Green to work several days before the stabbing, Defendant pulled alongside their car at a stop light in Carlsbad.  She testified that Green looked over at Defendant and spontaneously stated, "There's Joseph," while appearing to be "very agitated" and "scared."  She immediately looked over at the man her son was referring to and later identified Defendant in court as the man she had seen driving the adjacent car.  When the light changed to green, Defendant turned his car and drove away without making contact.

**{9}**     A hotel receptionist identified Defendant and testified that she had seen him loitering around the Carlsbad Quality Inn on two separate days.  On the first occasion, several days before Green was stabbed at the hotel, Defendant approached her desk to inquire about room rates, claimed that his vehicle had broken down in the hotel parking lot, and said that he was waiting for someone to come from Arizona to retrieve him and his vehicle.  He stayed around the hotel for most of that day.  At some point, he inquired about the alcohol server class at the hotel, and the receptionist advised him that it was not being held that week.  The

3

next time she saw Defendant was on September 24, the day when the servers' class attended by Green was actually held. She noticed Defendant in the lobby four different times that morning. At one point before noon, he came over to her desk and asked what time the servers' class would recess, claiming he had a friend in the class he was planning to take to lunch.

**{10}** The evidence of Defendant's presence at the Quality Inn during the hours before the stabbing was substantial. As Defendant candidly acknowledged in his own brief-in-chief, "[t]here were many witnesses that saw a person they later identified as Joseph Flores hanging around the Quality Inn on September 24, 2004." A second hotel employee testified that, in response to her inquiry to Defendant as to his presence at 8:30 a.m., he explained that he was waiting for someone who would be attending the class. After later seeing him in the dining room and the hallway, she asked him to wait outside. Numerous other witnesses saw him at various locations in and around the hotel on that morning.

**{11}** The class broke for lunch just before noon. During the break, Defendant was seen arguing with Green in front of an alcove on the side of the hotel. The argument was loud enough to be heard by several witnesses from around the corner of the hotel. When cries of pain rang out from the alcove, Green's classmates and hotel employees rushed toward the sounds and found Green lying in a fetal position covered in his own blood. He died nearly two months later from complications caused by the twenty-one stab wounds to his face, skull, chest, and left shoulder.

**{12}** Although no one reported seeing the actual stabbing, several witnesses testified to having seen Defendant calmly, even "non-chalant[ly]" walk away from the alcove directly after the cries were heard. Witnesses described Defendant's shirt, jeans, and hands as covered in blood. One witness testified that she saw Defendant holding a neon-green Phillips screwdriver with blood on it, while other witnesses saw Defendant remove a bloodied shirt from his torso as he left the scene. While neither the murder weapon nor the bloody clothing removed by Defendant was ever recovered, a medical expert testified that the majority of Defendant's eighteen head wounds were perfectly "cross-shaped" and between a quarter of an inch to a half inch in diameter, which the State argued were consistent with the cruciform point of a Phillips screwdriver.

**{13}** The State also presented evidence of Defendant's behavior after the stabbing. The Eddy County deputy sheriff who had called Defendant about his calls to Green's ex-wife eleven days earlier called him again at the same number within an hour after the stabbing. Defendant hung up on the officer twice as soon as the officer identified himself and asked Defendant where he was. On the third call, after the officer again started by asking Defendant where he was, Defendant did not answer the question but responded instead with questions of the officer, most significantly asking about "[w]hat happened to Vernon" before the officer mentioned anything at all about Green. When asked again about his whereabouts, Defendant claimed he was somewhere in California before the phone connection abruptly ended again.

4

**{14}** Defendant was next seen at work in Las Vegas, noticeably nervous, "smoking a lot of cigarettes and drinking a lot of water," on Monday, September 27, three days after Green was stabbed in Carlsbad. Defendant asked a coworker and his employer to sign affidavits representing that they had seen him at work in Las Vegas on September 24, the date of the stabbing. Both men testified at trial that the affidavits presented to them were false, because they had not really seen Defendant on that day.

**{15}** Defendant did not testify or present any other evidence.

## C. The Evidence Was Sufficient to Support Defendant's Conviction

### 1. *Sufficiency of the Evidence to Establish that Defendant Was the Killer*

**{16}** We reject as unworthy of extended discussion Defendant's cursory argument that the evidence was insufficient to support a conclusion that he was the person who stabbed Green. The evidence was simply overwhelming on that issue. Even without the extensive evidence of Defendant's stalking activities, his motive, and his coverup efforts, his identity as the killer was established by the eyewitness testimony about the sequence of his arguing and going to the alcove with Green, followed by Green's screams of pain, continuing with Defendant's walking out of the alcove holding the bloody screwdriver with blood all over his own hands and body, and concluding with the immediate discovery of Green's bloody body left alone on the floor of the alcove.

**{17}** The law does not require testimony from a witness who personally saw Defendant at the very moment he actually stabbed his victim. In fact, the totality of the compelling circumstantial evidence here far exceeds the quantum held "adequate to support the conclusion that Defendant killed the victim" in the absence of direct eyewitness testimony in *State v. Rojo*, 1999-NMSC-001, ¶ 23, 126 N.M. 438, 971 P.2d 829 (filed 1998). The fact that "each component may be insufficient to support the conviction when viewed alone does not mean the evidence cannot combine to form substantial, or even overwhelming, support for the conviction when viewed as a whole." *Id.*

### 2. *Sufficiency of the Evidence to Establish Deliberate Intent to Kill*

**{18}** The only sufficiency of evidence argument that we need address in any greater detail is the one that was the primary focus of Defendant's appeal: whether the evidence was sufficient to support the jury's determination that he committed the killing with the deliberate intent to kill that distinguishes first-degree from second-degree murder.

**{19}** In New Mexico, first-degree murder is defined as "any kind of willful, deliberate, and premeditated killing." NMSA 1978, § 30-2-1(A) (1994). "Deliberate intention" is intention that is "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *Cunningham*, 2000-NMSC-009, ¶ 25 (internal quotation marks and citation omitted). We have emphasized

5

that circumstantial evidence alone can amount to substantial evidence. *Id.* ¶ 29; *see also Rojo*, 1999-NMSC-001, ¶ 23. Indeed, "[i]ntent is subjective and is almost always inferred from other facts in the case . . . ." *Duran*, 2006-NMSC-035, ¶¶ 7-8 (internal quotation marks and citation omitted) ("Deliberate intent may be inferred from the particular circumstances of the killing . . . .").

**{20}** To support his argument of legal insufficiency, Defendant relies primarily on *Garcia*, in which this Court held that there was insufficient evidence of deliberation to uphold a first-degree murder conviction. 114 N.M. at 271, 837 P.2d at 864. The defendant and the victim in *Garcia* drank large amounts of alcohol and quarreled for a number of hours before eventually agreeing to fight. The fight culminated in the defendant's stabbing the victim in his chest several times. *Id.* at 270, 837 P.2d at 863. We concluded that there was insufficient evidence in *Garcia* "to support the jury's conclusion that . . . [the defendant] decided to stab [the victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice." *Id.* at 274, 837 P.2d at 867; *see also State v. Adonis*, 2008-NMSC-059, ¶ 20, 145 N.M. 102, 194 P.3d 717 (concluding that the record contained no evidence from which a factfinder could reasonably infer that there had been any "reflection or contemplation before the killing" by the defendant).

**{21}** The facts in *Garcia* have been distinguished many times by this Court from the facts in cases where there was sufficient evidence of deliberation. For example, in *Duran*, 2006-NMSC-035, ¶ 11, we found that the jury could draw rational inferences of deliberation from the large number of wounds, the evidence of a prolonged struggle, the evidence of the defendant's attitude toward the victim, and the defendant's own statements. *Duran* relied on a number of our precedents that had similarly rejected comparisons to the facts in *Garcia*:

> *See Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (deliberate intent to kill established when strangulation took several minutes and defendant had motive to kill victim); *Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P.3d 32 (evidence that defendant went armed to victim's home, waited for victim to arrive, shot at unarmed victim, and continued attack after victim tried to flee supported inference of deliberate intent); *State v. Coffin*, 1999-NMSC-038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (jury could infer defendant formed deliberate intent to kill victim when defendant told victim to get back in his car then shot victim several times from behind); *Cunningham*, 2000-NMSC-009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (deliberate intent inferred from defendant firing fatal shot at victim after victim was incapacitated and defenseless).

*Id.* ¶ 8.

**{22}** In this case, there was ample evidence from which a reasoning jury could have found that Defendant (1) was embittered by Green's rejection of him, (2) tried to hurt Green by

making scandalous accusations to his ex-wife and the police, (3) made methodical plans for a trip to New Mexico in pursuit of Green, (4) surreptitiously followed Green to Carlsbad, (5) stalked Green in Carlsbad over a period of days, (6) found out about Green's plans to attend the alcohol server class, (7) inquired about the time and place of Green's class, (8) found out when he could get Green alone during a class recess, (9) deliberately lay in wait for Green, (10) carried the screwdriver with him to the fatal confrontation for no other discernible purpose than to use it as a weapon, (11) stabbed Green so many times that it evidenced an effort at overkill, (12) immediately and calmly walked away from Green's bleeding body, (13) began getting rid of the evidence as he walked away, (14) fled the scene, (15) tried to deceive and evade the authorities, and (16) attempted to concoct a false alibi.

**{23}**    Not only may Defendant's acts before and during the crime provide evidence of intent, evidence of flight or "an attempt to deceive the police" may prove consciousness of guilt. *State v. Martinez*, 1999-NMSC-018, ¶¶ 29-30, 127 N.M. 207, 979 P.2d 718 (internal quotation marks and citations omitted).

**{24}**    The sufficiency of the evidence in this case provides a striking contrast with that which we have found insufficient to justify a reasoned finding of guilt beyond a reasonable doubt in *State v. Vigil*, 2010-NMSC-003, __ N.M. __, __ P.3d __ (No. 30,896, January 5, 2010), filed this same date. The totality of the evidence in this record certainly supports rational findings by a jury that Defendant personally inflicted the multiple deadly stab wounds and that he "acted deliberately, rather than rashly and impulsively, in killing" Green. *Adonis*, 2008-NMSC-059, ¶ 24. The jury would have been amply justified in reasoning from the evidence in this record that Defendant made and carried out a plan over a two-week period to exact revenge on Green for rejecting him and to make sure that if he could not have Green, no one else ever would. We therefore hold that substantial evidence supported the jury's determination that Defendant was guilty of willful, deliberate, and premeditated first-degree murder.

## II.    EVIDENTIARY ISSUES

### A.    Standard of Review

**{25}**    We examine the admission of evidence for abuse of discretion. *State v. Stanley*, 2001-NMSC-037, ¶ 5, 131 N.M. 368, 37 P.3d 85. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Woodward*, 121 N.M. 1, 4, 908 P.2d 231, 234 (1995) (citation omitted).

### B.    Evidence of Defendant's Scandalous Accusations Against Green

**{26}**    Defendant argues that the testimony concerning Defendant's accusations about the bizarre alleged plot by Green to kidnap, sodomize, and murder his own child was

inadmissible because the evidence was irrelevant under Rule 11-401 NMRA, was uncharged misconduct that did not meet the requirements of Rule 11-404(B) NMRA, and was more prejudicial than probative under Rule 11-403 NMRA.

### 1. Relevance

**{27}** First, we determine whether the trial court abused its discretion in finding the evidence relevant. Rule 11-402 NMRA makes it clear that only relevant evidence is admissible. Rule 11-401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As our case law has observed, "[a]ny doubt whether the evidence is relevant should be resolved in favor of admissibility." *State v. Balderama*, 2004-NMSC-008, ¶ 23, 135 N.M. 329, 88 P.2d 845. It is the role of the jury, not that of the court, to decide what weight, if any, to give the evidence in light of the factual context of a particular case. *Id.* ¶ 35.

**{28}** To determine whether Defendant's insistent, incredible, and uncorroborated accusations against Green were relevant, we consider whether they related to the issues in the case. *See id.* ¶ 24. The State clearly and repeatedly articulated its theory that the accusations displayed Defendant's motives and malicious intent toward Green. Proof of motive sheds light on the likelihood of a defendant's guilt, and intent is an essential element of murder. Evidence that makes motive or intent more or less probable is therefore relevant. *See id.* ¶ 25.

**{29}** We conclude that the evidence of Defendant's accusations against Green, while not conclusive when viewed in isolation from the other evidence, could have made it appear more probable to the jury that he was motivated to hurt or kill Green than would have been the case had the evidence been kept from them. The evidence therefore meets the definition of relevant evidence in Rule 11-401 and was admissible under Rule 11-402.

### 2. Uncharged Misconduct

**{30}** Defendant also argues that admission of his accusations against Green violated the first sentence of Rule 11-404(B): "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The very next sentence of the rule, however, makes it clear that evidence reflecting negatively on an accused's character or conduct is not made inadmissible for that reason, so long as it is relevant for reasons other than to show a defendant is the kind of person who might have committed the charged crime: "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.*

**{31}** We have noted that in order to avoid the introduction of uncharged misconduct that does no more than indicate a defendant is the kind of person inclined to commit the crime

8

charged or other bad acts, "it is incumbent upon the proponent of Rule 11-404(B) evidence to identify and articulate the consequential fact to which the evidence is directed. Part of the proponent's responsibility is also to cogently inform the court . . . [of] the rationale for admitting the evidence to prove something other than propensity." *State v. Gallegos*, 2007-NMSC-007, ¶ 25, 141 N.M. 185, 152 P.3d 828.

**{32}** As required by *Gallegos*, the State articulated both before and during trial that Defendant's accusations demonstrated attempts to hurt and isolate Green from others after the relationship breakup, evincing Defendant's motive and intent. In *Rojo*, 1999-NMSC-001, ¶ 47, we upheld the introduction of evidence of a defendant's prior violent acts against a victim and of his deteriorating relationship with the victim to support the state's theory that the defendant had a motive for killing her after she broke off their relationship. "[E]vidence of the deterioration of [the defendant's] relationship with the victim . . . directly addresses the motivational theories presented at trial." *Id*. In determining Defendant's guilt, the "jury may consider the relationship of the parties and the animus of the accused toward the deceased." *Id.* ¶ 24. The evidence here similarly helped shed light on the likelihood that Defendant was the killer and on the intent with which he acted. The evidence was therefore admissible under Rule 11-404(B).

### 3. *Prejudicial Impact Versus Probative Value*

**{33}** Finally, Defendant argues that the evidence of his accusations against Green was more prejudicial than probative and should have been excluded under Rule 11-403, which gives courts discretion to exclude otherwise relevant and admissible evidence if its probative value is substantially outweighed by its prejudicial impact. *Gallegos*, 2007-NMSC-007, ¶ 22; *see Rojo*, 1999-NMSC-001, ¶ 48.

**{34}** The accusations Defendant made to Green's ex-wife and the police purported to show scandalous intentions on the part of Green, not of Defendant. To the extent that they reflected adversely on Defendant instead of Green, it was only because they reflected a malicious intent to harm and isolate Green, which made them probative evidence of Defendant's own motive and intent. "[T]he fact that some jurors might find this evidence offensive or inflammatory does not necessarily require its exclusion." *Rojo*, 1999-NMSC-001, ¶ 48.

**{35}** "[D]etermining whether the prejudicial impact of evidence outweighs its probative value is left to the discretion of the trial court." *State v. Wilson*, 117 N.M. 11, 17, 868 P.2d 656, 662 (Ct. App. 1993). We should reverse only where we find the trial court has abused that discretion. *Rojo*, 1999-NMSC-001, ¶ 48. In this case, the State offered both testimony of Defendant's frantic "warning" calls and the actual images he faxed to Green's ex-wife that he claimed were illustrations of what Green intended to do to his own son. After considering the arguments of counsel, the district judge made considered decisions to admit the testimony and exclude the graphic depictions as unduly prejudicial.

9

**{36}** It is obvious that the trial judge took seriously his responsibility under Rule 11-403 to balance the prejudicial and probative aspects of the evidence by permitting testimony related to the accusations while barring the related graphic images. Because the evidence was probative of motive and intent, and because the trial court took prudent and reasonable steps to minimize any unduly prejudicial effect, we conclude that admission of the testimony was not an abuse of discretion.

## C.      Admission of Green's Hearsay Identification of Defendant

**{37}** We next address Defendant's argument that Green's mother's testimony about her son's spontaneous declaration, "There's Joseph," upon seeing Defendant driving next to him in Carlsbad, was inadmissible hearsay.

**{38}** The statement was clearly hearsay, as defined by Rule 11-801(C) NMRA of the New Mexico Rules of Evidence: "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It certainly was an out-of-court statement, and its only probative value was in establishing that, as Green indicated, Defendant was already in Carlsbad four days before the stabbing.

**{39}** Categorization of a statement as hearsay, however, is only the beginning point of a hearsay admissibility determination. Once a statement is determined to be hearsay, it is necessary to consider whether it fits one of the numerous exceptions to Rule 11-802's default position of exclusion: "Hearsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute." Rule 11-802 NMRA. The trial court determined that the statement was admissible as a hearsay exception, observing only that the "res gestae rules that the courts have followed over the years have been . . . changed."

### *1.      Res Gestae*

**{40}** The Latin term "res gestae" means "the events at issue or others contemporaneous with them." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 761 (2d ed. 1995). It has been used historically in the context of various evidentiary and nonevidentiary issues in the case law. *See, e.g., State v. Finchum*, 111 N.M. 716, 717-18, 809 P.2d 630, 631-32 (1991) (holding that a res gestae theory justified joinder for trial of charges of murder of a male victim and battery against a female victim where evidence of the battery would have been admissible in a separate murder trial on a res gestae theory); *State v. Farris*, 95 N.M. 96, 97, 619 P.2d 541, 542 (1980) (discussing whether the victim's provocative conduct was sufficiently within the "res gestae of the killing" to justify a voluntary manslaughter instruction in a murder case), *overruled on other grounds by Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982); *State v. Stephens*, 93 N.M. 458, 462, 601 P.2d 428, 432 (1979) (holding in a felony-murder prosecution that a defendant was entitled to a jury instruction on second-degree murder because there was an issue as to "whether the murder was committed as part

of the res gestae of the felony of robbery"), *overruled on other grounds by State v. Contreras*, 120 N.M. 486, 903 P.2d 225 (1995); *State v. Paris*, 76 N.M. 291, 294, 414 P.2d 512, 514 (1966) (holding that "the confession of an accused, not a part of the res gestae," as well as a confession that is part of the res gestae of a crime, may be used to prove the commission of the corpus delicti of a crime).  As many as seven distinguishable legal concepts have historically been referred to by use of this same term.  4 Michael H. Graham, *Handbook of Federal Evidence* § 803:2, at 90 (6th ed. 2006).

**{41}**  When used in the evidentiary context, res gestae most commonly has referred to a cluster of judicially-created exceptions to the exclusion of evidence on hearsay grounds that first came into use in the early 1800s.  *See* 6 John Henry Wigmore, *Evidence* § 1767, at 181 (3d ed. 1940); *see, e.g., State v. Goodwin*, 51 N.M. 65, 71, 178 P.2d 584, 588 (1947) (holding that a spontaneous statement under stress was admissible under "the res gestae exception to the hearsay rule").  While widely used before adoption of the modern evidence codes, the term had been repeatedly criticized by courts and commentators.  Judge Learned Hand described it as "a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology."  *United States v. Matot*, 146 F.2d 197, 198 (2d Cir. 1944).  It has been described as "not only entirely useless, but even positively harmful" and deserving of being "repudiated as a vicious element in our legal phraseology."  6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1767, at 255 (James H. Chadbourn rev. 1976).  It is not only so vague as to create more problems than it resolves, it is a completely unnecessary term in the evidence context because "every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle."  *Id.*

**{42}**  When the Federal Rules of Evidence were adopted, they avoided any use of the term res gestae whatsoever.  Proposed Federal Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183 (1972) (ordering promulgated Rules of Evidence transferred to Congress for approval).  Despite our prompt adoption of the Federal Rules of Evidence in 1973, *see State v. Martinez*, 2008-NMSC-060, ¶ 25, 145 N.M. 220, 195 P.3d 1232, the term still occasionally has crept back into judicial opinions.  *See, e.g., Finchum*, 111 N.M. at 717, 809 P.2d at 631(referring to the State's reliance on "the 'res gestae' exception of the hearsay rule set forth in *State v. Mottola*, 84 N.M. 414, 504 P.2d 22 (Ct. App. 1972)"); *State v. Cozzens*, 93 N.M. 559, 561, 603 P.2d 298, 300 (Ct. App. 1979) (determining that a hearsay statement was "not admissible as part of the res gestae").  Our Court of Appeals has accurately cautioned that "both courts and commentators have largely abandoned the general haze of the *res gestae* doctrine."  *State v. Rael*, 117 N.M. 539, 542 n.1, 873 P.2d 285, 288 n.1 (Ct. App. 1994) (internal quotation marks and citation omitted).

**{43}**  We agree that the phrase "*res gestae*, in itself, adds nothing but confusion to an already complex area of the law.  The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented."  *State v. Hansen*, 989 P.2d 338, 354 (Mont. 1999); *see also State v. Kemp*, 948 A.2d 636, 652 (N.J. 2008) (Albin, J., concurring) (cataloguing

11

numerous federal and state appellate "courts throughout the country [that] have already come to the conclusion that res gestae is outdated, is no longer relevant, and should be discarded").

**{44}**     The fact that the trial judge in this case referred to the principle justifying admission by the old term of res gestae, rather than the terms used in the New Mexico Rules of Evidence, does not mean the admission of the testimony was error, since "we may uphold the judge's decision if it was right for any reason." *State v. Macias*, 2009-NMSC-028, ¶ 17, 146 N.M. 378, 210 P.3d 804.  We turn, therefore, to an analysis of the specific hearsay exceptions explicitly set forth in the rules, which by their own terms, "govern proceedings in the courts of the State of New Mexico."  Rule 11-101 NMRA.

### 2.     *Excited Utterance*

**{45}**     Rule 11-803(B) NMRA provides for the admissibility over a hearsay objection of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  This common-law-based exception had been deduced and articulated by Dean Wigmore in his analysis of one of the most common applications of the res gestae exception in the case law, *see* 6 Wigmore, *supra*, §§ 1745-1763, at 131-76 (3d ed. 1940), and "finds abundant support in the decided federal cases." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(2)[01] (1985).  It was recognized through the res gestae concept by pre-rules New Mexico cases.  *See, e.g., Goodwin*, 51 N.M. at 71, 178 P.2d at 588.

**{46}**     Defendant argues that the excited utterance exception does not apply here because there was insufficient excitement in the victim's voice when he spontaneously uttered "There's Joseph" upon seeing Defendant driving along next to him.  Defendant's argument both disregards the reasoning underlying the excited utterance exception and takes an overly narrow view of  the word "excited."

**{47}**     As we have recently emphasized, "[t]he theory underlying the excited utterance exception is that the exciting event induced the declarant's surprise, shock, or nervous excitement which temporarily stills capacity for conscious fabrication and makes it unlikely that the speaker would relate other than the truth." *Macias*, 2009-NMSC-028, ¶ 30 (internal quotation marks and citation omitted).  Accordingly, to constitute an excited utterance, "the declaration should be spontaneous, made before there is time for fabrication, and made under the stress of the moment." *State v. Martinez*, 102 N.M. 94, 99, 691 P.2d 887, 892 (Ct. App. 1984).

**{48}**     There is nothing in the case law nor in the ordinary meaning of "excited" which restricts the meaning of the word to any narrow requirement of a frenzied or hyperactive state. *The American Heritage Dictionary of the English Language* 620 (4th ed. 2000) defines "excited" as "[b]eing in a state of excitement; emotionally aroused; stirred" and defines "excite" as "1.  To stir to activity.  2.  To call forth (a reaction or emotion, for example); elicit: *odd noises that excited our curiosity . . . .*"

**{49}** We apply the excited utterance analysis to a particular fact situation through an examination of the totality of the circumstances, including

> how much time passed between the startling event and the statement, and whether, in that time, the declarant had an opportunity for reflection and fabrication; how much pain, confusion, nervousness, or emotional strife the declarant was experiencing at the time of the statement; whether the statement was self-serving[; and whether the statement was] made in response to an inquiry.

*Balderama*, 2004-NMSC-008, ¶ 51 (internal quotation marks and citation omitted).

**{50}** In this case, the totality of the circumstances surrounding Green's declaration indicates that he was making an utterance in direct and immediate response to a surprising event that triggered an emotional response. Shortly before the stabbing, Green moved over eight hundred miles to Carlsbad. The evidence at trial indicated that he did so because he had left a troubled relationship with Defendant. It is a reasonable inference that Green was startled to see that Defendant had tracked him down from Nevada to New Mexico. Green's appearance to his mother as "very agitated" and "scared" upon seeing Defendant further indicates that he responded emotionally when making his immediate and spontaneous utterance, "There's Joseph." The testimony established a textbook case for application of the excited utterance exception, and Green's hearsay statement to his mother identifying Defendant as the driver of the nearby car was admissible on that ground alone.

### 3. *Present Sense Impression*

**{51}** The testimony was equally admissible under the present sense impression exception. A present sense impression is a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *Macias*, 2009-NMSC-028, ¶ 29 (internal quotation marks and citation omitted). As the advisory committee notes to the Federal Rules of Evidence observe, "[i]n considerable measure the [excited utterance and present sense impression exceptions] overlap, though based on somewhat different theories. The most significant practical difference will lie in the time lapse allowable between the event and statement." Fed. R. Evid. 803(1)-(2) advisory committee's notes. The theory underlying the present sense impression exception is that "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Id.*

**{52}** Both excited utterances and present sense impressions were among the theories subsumed within the pre-rules res gestae cluster of exceptions. 4 Graham, *supra* § 803:2, at 75-100. As their textual elements indicate, they differ in that an excited utterance requires a reasonable inference that emotional stress has contributed to the making of the statement, while present sense impression requires instead that the statement be substantially contemporaneous with the event it is describing or explaining. 2 Kenneth S. Broun,

13

*McCormick on Evidence* § 271, at 251 (6th ed. 2006); *see Salgado*, 1999-NMSC-008, ¶ 13 (observing that reliability of a present sense impression is enhanced by the requirement of a contemporaneous statement); *see also State v. Perry*, 95 N.M. 179, 180, 619 P.2d 855, 856 (Ct. App. 1980) (analyzing timeliness in applying the exception).

**{53}** The disputed testimony in this case presents no timeliness issue whatsoever. Green uttered, "There's Joseph," at the very moment he was looking at Defendant in the car next to him and his mother. *Cf. State v. Massengill*, 2003-NMCA-024, ¶ 10, 133 N.M. 263, 62 P.3d 354 (concluding that four or more hours between an event and a statement describing that event are not "sufficiently contemporaneous"). There was virtually no time for Green to decide to misrepresent to his mother that Defendant was driving along the streets of Carlsbad, presumably so Defendant could be falsely accused of killing Green several days in the future. There simply was "no apparent motive to lie." *Perry*, 95 N.M. at 180, 619 P.2d at 856 (observing that an admissibility decision should take into account the declarant's motive to lie).

**{54}** One of the additional indicia of reliability of a present sense impression may be that the person to whom the statement is made is often in a position to verify the accuracy of the statement. 2 Broun, *supra* § 271, at 251. Although independent corroboration is not a foundational requirement for admission, it may be a factor in the trial judge's exercise of discretion in admitting the hearsay. *State v. Case*, 100 N.M. 714, 718, 676 P.2d 241, 245 (1984) (holding that the lower court did not abuse its discretion by excluding an absent declarant's statement of identification after a fleeting view of a person, where the testifying witness was unable to verify the accuracy of the identification). In this case, Green's mother looked over at the adjacent driver her son was identifying and later testified that Defendant was the person she had seen. Defense counsel was unable to cast any doubt on her testimony during an unlimited cross-examination.

**{55}** We conclude that, under these circumstances, the statement by Green to his mother contemporaneously identifying Defendant as the driver of the neighboring car as Defendant was clearly admissible under the present sense impression exception to the hearsay rule.

**D.      Admission of an In-Court Identification of Defendant**

**{56}** Two weeks after Green was stabbed, his sister showed the Quality Inn receptionist, with whom she previously had worked, a photograph of Defendant to see if the receptionist recognized him. The receptionist immediately responded: "That's the guy." Defendant argues that the receptionist's subsequent in-court identification of Defendant as the man she spoke with and saw around the hotel several times, including the date of the stabbing, was inadmissible as a product of an unnecessarily suggestive pretrial identification procedure. The parties have neither raised nor briefed any issue about the lack of any involvement by a state actor in the display of the photograph to the witness; in view of our conclusion that the in-court identification was not tainted by the pretrial photo showing, we find it unnecessary to consider the issue. *See* Lynn M. Talutis, *Admissibility of In-Court*

14

*Identification as Affected by Pretrial Encounter that was not Result of Action by Police, Prosecutors, and the Like*, 86 A.L.R. 5th 463 (2001) ("To suppress an in-court identification that follows an allegedly suggestive pretrial encounter, courts have traditionally required that the pretrial encounter have resulted from some type of government action.").

**{57}**    In the absence of exigent circumstances, an out-of-court identification procedure using only one suspect or photograph is impermissibly suggestive. *State v. Nolan*, 93 N.M. 472, 476, 601 P.2d 442, 446 (Ct. App. 1979). Ultimately, however, "the linchpin in determining the admissibility of identification testimony is whether the testimony is reliable." *State v. Baca*, 99 N.M. 754, 758, 664 P.2d 360, 364 (1983). In *Baca*, we relied on a line of United States Supreme Court precedents establishing the "independent source" test: "the issue is whether the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime, or whether he is merely remembering the person he picked out in a pretrial procedure." *Manson v. Brathwaite*, 432 U.S. 98, 122 (1977).

**{58}**    In this case, the district judge took testimony out of the presence of the jury from the receptionist-witness, the sister who had shown her the photo, and an investigating officer who had later conducted a proper identification process with the witness.

**{59}**    The receptionist testified that she had observed and talked with Defendant several days before the day of the stabbing, when he approached her and discussed several matters, including the scheduling of the alcohol server class that was to be held the day of the stabbing. She testified that she also observed Defendant loitering around the hotel three or four separate times on the day of the stabbing. On one of these occasions, Defendant approached her and initiated a conversation to find out when the alcohol server class would be recessed for lunch. She was able to describe Defendant's physical features, manner of speech, and the clothing he wore on the day of the stabbing. When asked whether seeing the single photo influenced her memories about her observations and identification of Defendant, the witness responded, "Absolutely not." According to the investigating officer, the receptionist unhesitatingly identified Defendant from a non-suggestive pretrial police photo array.

**{60}**    The totality of the circumstances strongly supports the trial court's findings that the witness's identification of Defendant was reliable and was not influenced by the out-of-court identification. "Once a court finds that the evidence is admissible, it becomes a jury determination as to the accuracy of a witness' identification." *State v. Cheadle*, 101 N.M. 282, 286, 681 P.2d 708, 712 (1983), *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783. Even though the State did not elicit testimony of the pretrial photo identification before the jury, the trial court properly permitted defense counsel to raise and explore the subject, for whatever weight the jury chose to give it. The court followed the correct procedures in dealing with the matter, and the record amply supports the decision to permit the receptionist's in-court identification of Defendant as the man she had seen and conversed with at the hotel.

## III.    CONCLUSION

**{61}**    We hold that Defendant's conviction was supported by sufficient evidence and that the trial court did not abuse its discretion in making the various evidentiary rulings challenged by Defendant.  We therefore affirm Defendant's conviction and sentence.

**{62}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Flores*, No. 29650**

| **CL** | **CRIMINAL LAW** |
| --- | --- |
| CL-CF | Capital Felony |
| CL-HO | Homicide |
| CL-MU | Murder |
| CL-SI | Specific Intent |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-ID | Identification of Defendant |
| **AE** | **APPEAL AND ERROR** |
| AE-SB | Substantial or Sufficient Evidence |
| **EV** | **EVIDENCE** |
| EV-AE | Admissibility of Evidence |
| EV-CE | Character Evidence |
| EV-EU | Excited Utterance |
| EV-HR | Hearsay Evidence |

| | |
|---|---|
| EV-PI | Present Sense Impression |
| EV-PJ | Prejudicial Evidence |
| EV-RC | Relevancy, Materiality, and Competency |
| EV-SS | Substantial or Sufficient Evidence |
| EV-WT | Witnesses |