This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

v.                                       **NO. 32,911**

**ANTHONY CASILLAS,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
Robert S. Orlik, District Judge

Liane E. Kerr, LLC
Liane E. Kerr
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Olga Serafimova, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

{1}   Defendant Anthony Casillas ("Defendant") appeals to this Court from two consecutive life imprisonment sentences, plus a five and a half year sentence, stemming from convictions for two counts of first degree murder and one count of felon in possession of a firearm. These sentences are in connection with the shooting deaths of Gary Payne ("Payne") and Melissa Ward ("Ward"). On appeal, Defendant raises seven issues he argues justify a reversal of his convictions. We reject each of Defendant's arguments and affirm his convictions.

## I.   BACKGROUND

{2}   Defendant was charged and ultimately convicted for the September 25, 2008, murders of Payne and Ward. Defendant and Ward were passengers in a van driven by Payne when Defendant shot both Payne and Ward in the head from behind, subsequently causing the van to crash into a brick wall. Payne was discovered in the driver's seat of the van, while Ward was found on the floor of the van behind the passenger's seat. Both died from gunshot wounds to the head. On the night of the accident, eyewitness Brandon Parker ("Parker"), who was acquainted with Payne, observed Payne driving the van down the street. He later heard two gunshots and saw two flashes inside the van, then heard a loud crash as the van collided with a brick wall. When Parker and several others ran to the site of the accident, Parker's cousin "Kiree" ("Kiree") indicated he saw someone flee from the scene of the crash. He

2

asked Parker, "Did you see that person running?"

{3}    A first responder discovered the murder weapon in the van. It was a black, High Point .380 ACP handgun. The slide was locked in the back position and the magazine was empty, indicating that only the two bullets used to kill Payne and Ward had been in the gun. Police determined that Payne was shot first while he drove the van. Ward was sitting in the front passenger seat and was shot on the left side of her face when she turned towards Payne after he was shot. Two bullet casings were found in the cargo area of the van. Since the crash rendered the van's doors inoperable, evidence indicated that the shooter moved Ward's body to the backseat and kicked out the passenger window to escape. Defendant's blood and Payne's blood were found on the outside of the vehicle on the passenger's side. Defendant's fingerprints were found on the magazine of the murder weapon, and a bag with some of his personal effects was discovered in the van. A trail of Defendant's blood led from the crash site to apartment 6 of the nearby Clovis Apartments. Payne's blood was later found in the apartment, although he had purportedly never been there and was unacquainted with the apartment's primary occupant, Sabrina Martinez ("Martinez").

{4}    Defendant frequently stayed at Martinez's apartment, which she occupied with Defendant's cousin, Adrian Casillas ("Adrian"). On the night of the murders, Martinez was in her apartment watching television with Adrian and her son when she

3

heard two gunshots and a loud noise, followed by people screaming. A few minutes later, Defendant knocked on her door. When he came inside the apartment, he began pacing while repeating to himself, "What did I just do?" and "I'm sorry." Martinez said he appeared to be in shock and was not acting normally. A dinner-plate sized stain of wet blood covered his shirt, and he had a cut on his hand. Defendant took a shower, changed into clean clothes, and after briefly watching television with the others, went to bed. The next day, Martinez and Adrian gave Defendant a ride to his cousin Mary Helen Roman's ("Roman") house, and he took a bag of clothes with him. Martinez immediately returned home and cleaned her apartment, but did not find Defendant's bloody shirt.

{5}     That day, Defendant's girlfriend, Priscilla Carrasco ("Carrasco"), who was staying at Roman's house, agreed to go to Roswell, New Mexico, with him after he confided to her and Roman that he had been in a fight and needed to leave town. Defendant did not have a bag of clothing with him when he entered Roman's house, and did not put anything in Carrasco's car. Once in Roswell, Defendant left Carrasco at a friend's home, whom Carrasco did not know, and Defendant did not return. Several days after abandoning Carrasco in Roswell, Defendant turned himself in at the Roswell police station. He was subsequently charged with two counts of first degree murder in violation of NMSA 1978, Section 30-2-1(A)(1), one count of tampering

4

with evidence in violation of NMSA 1978, Section 30-22-5 and one count of possession of a firearm or destructive device by a felon in violation of NMSA 1978, Section 30-7-16.

{6}     Before Defendant's first trial, he made several phone calls from jail to Carrasco, warning her not to say anything to the police and to tell his uncle Steven Casillas ("Steven") to "kick everyone" at work who said Defendant was the killer. Defendant's family also called Carrasco  a "snitch" and a "cop-calling bitch." Additionally, Martinez's tires were slashed after arguing with Defendant's cousin about testifying. During the first trial, Steven was beaten and threatened on the morning he was to testify.  When he collapsed on the stand due to his injuries, the judge granted a mistrial. Due to local media coverage following the mistrial, the judge ordered a change in venue from Curry County to Roosevelt County.

{7}     During Defendant's second trial, Steven testified again. He testified that he also worked with Payne and Defendant, and had served time in prison for murder. The State asked him if Defendant said that were he to be incarcerated, he wanted it to be for murder. Steven responded in the negative. The State pressed Steven on this issue, which prompted defense counsel to object and move for a mistrial on the grounds of prosecutorial misconduct by the State.  The trial court denied the motion and admonished the State to accept the answer that Steven gave and to discontinue the line

5

of questioning. Steven did testify that Defendant often carried a black .380 handgun in the back of his pants. Martinez and Carrasco corroborated this testimony by testifying that they had also seen Defendant with Adrian's black semi-automatic gun, though they never saw Defendant with a gun after the murders. Defendant had access to Adrian's gun whenever he wanted to use it.

{8}    Also during the second trial, State witness Detective Sandy Loomis ("Loomis") was recognized as an expert despite defense counsel's objections that he was unqualified in blood evidence and that his testimony would contain hearsay. Loomis' testimony largely concerned blood spatter analysis to reconstruct the crime scene. Defense counsel objected on the basis that Loomis' testimony was based on hearsay and that he was providing a "theory" of the case that would divest the jury of its duty to determine what happened.

{9}    Finally, the State adduced at the second trial that Defendant was acquainted with Payne through work. They had an acrimonious relationship, and argued over money on the day of the murders. Payne refused to loan Defendant $5.00, despite owing him that amount from a bet. After Payne refused to give Defendant $5.00, Defendant said he would just take it, to which Payne replied that Defendant would take "nothing but an ass-kicking." Another cause of discord between Defendant and Payne were Payne's comments about having sex with underage Mexican prostitutes,

6

which angered Defendant.

## II.    DISCUSSION

{10}    Defendant was charged with and convicted on two counts of first degree murder in violation of NMSA 1978, Section 30-2-1(A)(1); one count of tampering with evidence in violation of NMSA 1978, Section 30-22-5; and one count of possession of a firearm by a felon in violation of NMSA 1978, Section 30-7-16.  On appeal he raises seven issues, asking the Court to consider whether:  (1) the trial court erred in recognizing Detective Loomis as an expert and allowing him to speculate on the evidence; (2) the State violated Defendant's rights to due process and a fair trial by making repeated referrals to uncharged criminal conduct; (3) it was error to ask the trial court to take judicial notice of worldwide population numbers; (4) Defendant's rights to confrontation were violated by admitting evidence of an absent witness's statements and hearsay testimony; (5) consecutive life sentences violate the separation of powers by divesting the Parole Board of its obligations; (6) cumulative errors were compounded by the prosecution's unprofessional conduct and burden-shifting; and (7) the evidence was insufficient to support a conviction of first-degree murder and tampering with evidence. We address each of Defendant's issues below.

**A.    THE TRIAL COURT DID NOT ERR IN RECOGNIZING DETECTIVE LOOMIS AS AN EXPERT.**

{11}    Defendant argues that the trial court erred in recognizing Loomis as an expert, and further contends that Loomis was allowed to speculate on the evidence by providing a theory of the case. He asserts that Loomis was not qualified in the area of reconstruction and that the testimony given was not intended to assist the trier of fact. Finally, Defendant argues that allowing Loomis to testify as to his theory of the case violated the Due Process Clause because it allowed the jury to find him guilty by simply substituting his conduct with Loomis' testimony in order to reach conclusions about his mental state.

{12}    We review the qualification of an expert and admission of expert testimony for an abuse of discretion. *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993). Rule 11-702 NMRA provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." We stated in *State v. Alberico* that the rule creates three prerequisites for admission of expert testimony: (1) the expert must be qualified; (2) the expert's testimony must assist the trier of fact; and (3) the expert may only testify as to scientific, technical or specialized knowledge. 116 N.M. at 162, 861 P.2d at 202.

{13}    The trial court did not abuse its discretion in qualifying Loomis as an expert in

8

crime scene investigation. He testified that he had over thirty years experience as a law enforcement officer, the majority of which was spent as an investigator. In that time, he testified that he had extensive training in criminal investigation, including course work in shooting reconstruction and blood splatter analysis and interpretation. Finally he testified that he was previously qualified as an expert in the Ninth Judicial District. Based on this testimony, the trial court judge had sufficient information upon which to soundly use its discretion to qualify Loomis as an expert under Rule 11-702.

{14} With regard to the second and third prerequisites, Loomis testified to technical and specialized knowledge regarding the blood trail that led from the crime scene to Martinez's apartment. This information would certainly assist the trier of fact in determining the connection between the apartment and the crime. Therefore, he met the requirements under the rule, and the trial court judge appropriately admitted his testimony as an expert.

{15} Defendant's due process argument is not well taken, as we do not agree that Loomis' testimony improperly relieved the State from proving beyond a reasonable doubt that he committed the crimes charged. Loomis testified, in pertinent part, that based on the evidence he both collected and reviewed: the van crashed; a third person, who was in the van, exited it through the passenger window; based on a trail of blood found, the third person traveled from the van to Martinez's apartment; and

9

that a sample of Payne's blood, as confirmed by lab reports, was located in the apartment. He also testified that a bag was found in Payne's van containing tattoo templates, including a template matching a tattoo on Defendant's chest; and that Defendant's bloody clothes were not found. This testimony was properly admitted, and it still left the jury to determine both its probative value and credibility. At no time did Loomis state that he believed Defendant to be guilty of the crimes, nor did he state generically that the evidence proved guilt. As such, we do not believe Defendant's due process rights have been violated.

**B.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING TESTIMONY REGARDING DEFENDANT'S POSSESSION OF A GUN BEFORE THE CRIME AT ISSUE AND DID NOT ABUSE ITS DISCRETION IN ADMITTING TESTIMONY REGARDING THREATS MADE TO MARTINEZ AND CARRASCO.**

{16}     Defendant contends that his rights to due process and a fair trial were violated by the State's repeated referrals to uncharged criminal conduct during the course of the trial, specifically Defendant's prior possession of a gun by a felon and witness intimidation. Specifically, he asserts that the trial court erred in admitting testimony from Martinez, Carrasco and Steven that each had seen him with a black handgun prior to the killings of Payne and Ward. Defendant further contends that it was error to admit the testimony of Martinez that the tires of her vehicle were slashed so as to dissuade her from testifying against him.

10

{17}    While the State's witnesses testified to having seen Defendant with a gun, none positively identified the gun used in the murder as the gun Defendant previously had in his possession. Defendant argues that introducing evidence of his prior possession of a gun, without conclusively identifying it as the same gun used in the murders, served only to characterize the him as a bad person. As such, Defendant argues that it was propensity evidence and the repeated references to past gun possession were introduced to show conformance, as was the testimony regarding the intimidation of witnesses. On these grounds, Defendant contends generically that the State violated his right to a fair trial by repeatedly referring to uncharged criminal conduct. The crux of his argument is that all of this testimony was prejudicial propensity evidence offered by the State to paint Defendant in a negative light and infer his guilt, which he contends is a violation of Rule 11-404(B) NMRA.

{18}    Under Rule 11-404(B), evidence of prior bad conduct is not admissible to show that on a particular occasion, the defendant has acted in accordance with his prior bad acts. The Rule does provide however, that evidence of prior bad acts is admissible to prove such things as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). "We review a trial court's decision to admit evidence under Rule 11-404(B) for abuse of discretion, which occurs when the court's ruling is clearly against the logic and effect

of the facts and circumstances of the case." *State v. Sena*, 2008-NMSC-053, ¶ 12, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). "If the evidence is probative of something other than propensity, then we balance the prejudicial effect of the evidence against its probative value." *State v. Lovett*, 2012-NMSC-036, ¶ 32, 286 P.3d 265 (internal quotation marks and citation omitted).

{19} The trial court did not abuse its discretion where it admitted testimony regarding Defendant's possession of a handgun prior to the murders of Payne and Ward. As the State points out in its answer brief, this testimony was not offered to show that Defendant had a propensity to carry a gun, therefore he must have been carrying a gun on the night Payne and Ward were murdered. Rather, it was offered as circumstantial evidence to connect Defendant to the gun used in the murders and found at the scene of the crime. While circumstantial evidence may be of weaker evidentiary value, there was no unfair prejudice in admitting this testimony, as ultimately there was fingerprint evidence that connected Defendant to the murder weapon.

{20} With respect to the testimony from Martinez that she was discouraged from testifying when her tires were slashed, there does not appear to be a Rule 11-404(B) issue here. None of the testimonial evidence regarding the slashing of her tires indicated that Defendant was personally responsible, so it is unclear how it would be

12

used to show Defendant's criminal propensity. We are also not convinced that its probative value, whatever it may have been, was outweighed by any prejudice to Defendant. That there was evidence that Defendant made phone calls from jail to Carrasco, directing her to refrain from testifying, as well to convince others to refrain, was sufficient to show that he was attempting to prevent certain witness testimony, irrespective of Martinez's statements.

**C.** **THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT TOOK JUDICIAL NOTICE OF THE WORLDWIDE POPULATION NUMBERS OFFERED BY THE STATE.**

{21} Defendant argues it was error for the trial court to take judicial notice of worldwide population numbers. The State asked the trial court to take judicial notice of the world population in order for its expert witness to testify as to ethnic populations. Defense counsel objected, and he was overruled. The trial court took judicial notice of the world population and read the following to the jury: "In accordance with documentation provided from Princeton University, the current population of the entire world appears to be approximately 6,908,688,000." On appeal, Defendant contends that an approximation cannot be used to take judicial notice, and notes that various sources listed different worldwide population estimates. For example, the U.S. Census Bureau estimated the world population in August 2010 to be 6,860,686,158. The Defendant argues that prejudice is apparent since "the

13

population numbers were used by the State to bolster it's [sic] DNA expert's testimony as to the data presented to the jury." Since the world's population is not capable of accurate determination, and any number would amount to nothing more than a "guesstimate," the Defendant argues that it must necessarily be error to take judicial notice of the world's population.

{22} Rule 11-201(B) NMRA allows a court to take judicial notice of an adjudicative fact, which: "(1) is generally known within the court's territorial jurisdiction, (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, or (3) notice is provided for by statute." We find that the second requirement was met in this case, and in so doing, recognize the inherent impossibility in a reliable source reporting a single, static number reflecting the world's population. For this reason, Defendant's argument that the figure noticed below was an approximation subject to dispute is not well taken. The figure reported here is as accurate as possible under the circumstances and comes from one of the nation's most reputable universities, thus the trial court appropriately used its discretion in noticing it.

{23} Further, there is no showing of prejudice to Defendant from the trial court's notice of the Princeton figure. Significantly, the jury was not bound by the worldwide population judicially noticed in this case. While in civil cases any judicially noticed

14

fact must be accepted as true, in a criminal trial the jury "may, but is not required to, accept as conclusive any fact judicially noticed." Rule 11-201(F), NMRA. Because the jury was not required to accept the judicially noticed fact, and because there is no indication of a reasonable probability that the world's purported population contributed to Defendant's conviction, the admission of the world's population was not prejudicial.

**D.     DEFENDANT'S RIGHTS TO CONFRONTATION WERE NOT VIOLATED BY THE TRIAL COURT'S ADMISSION OF EVIDENCE OF ADRIAN'S STATEMENT AND HEARSAY TESTIMONY THAT KIREE SAW SOMEONE LEAVE THE SCENE OF THE CRIME.**

{24}     Defendant next contends that his rights to confrontation were violated in two ways: (1) allowing hearsay testimony that Kiree saw someone leave the crash site, and (2) the acknowledgment of Adrian's interviews with police officers. The State did not call Kiree as a witness, and Adrian could not be located to testify. Parker's testimony regarding Kiree's exclamation was allowed into the record as an excited utterance and a present sense impression. After a police officer testified to having interviewed Adrian following the murders, defense counsel moved for a mistrial and prosecutorial misconduct, both of which were denied. However, the trial court did not allow further inquiry into the content of the interviews, and instructed the jury to disregard the question regarding the interviews.

15

{25} The Sixth Amendment's Confrontation Clause states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. A crucial element of the Confrontation Clause is that admissions of ex-parte examinations as evidence against the accused are barred. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Sixth Amendment prohibits testimonial statements made outside of court where a defendant has not previously had the opportunity to cross-examine the accuser. *Id*. at 50-51. While the Supreme Court of the United States has never conclusively defined "testimonial," at a minimum it includes "police interrogations" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 52, 68. Because an accuser who makes a formal statement to government officers bears "testimony" in a way that a person making a casual remark to another person does not, both this Court and the United States Supreme Court limit the Confrontation Clause's reach to testimonial statements. *Id.* at 68.

{26} With respect to the officer's testimony that he interviewed Adrian, there is no Confrontation Clause issue because Defendant does not challenge any statement made by Adrian. He simply challenges the officer's testimony that he interviewed Adrian. The testimony Defendant challenges did not constitute the statement of an absent

16

witness who could not be confronted during trial. As such, Defendant's confrontation rights were not violated because there was no admitted testimony of a witness he had no opportunity to confront.

{27} Kiree's statement to Parker was not testimonial in nature because it was an informal statement made to Parker that could not have reasonably been believed to be available for use at a later trial. Therefore, the Confrontation Clause is not implicated. As such, the admissibility of Kiree's statement is examined under the rules of evidence. *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280, *overruled on other grounds by State v. Tollardo* (2010) (citing *Davis v. Washington*, 547 U.S. 813 (2006)). We review the admission of evidence for abuse of discretion and note that trial courts have "broad latitude in exercising their discretion under this rule." *State v. Chavez*, 2008-NMCA-125, ¶ 9, 144 N.M. 849, 192 P.3d 1226 (citing *State v. Salgado*, 1999-NMSC-008, ¶¶ 5- 6, 126 N.M. 691, 974 P.2d 661). An abuse of discretion occurs "when the ruling is clearly against the logic and effect of the facts and circumstances of the case," and "[w]e cannot say the [district] court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Telles*, 2011-NMCA-083, 150 N.M. 465, 261 P.3d 1097 (citing *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (1998) (internal quotation marks and citation omitted)).

17

**{28}** Hearsay is an out-of-court statement (an oral or written assertion) by a person offered into evidence to prove the truth of the matter asserted in the statement. *See* Rule 11-801(A)(1)-(C) NMRA. Rule 11-803 NMRA provides that the following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: "(1) Present Sense Impression. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it; (2) Excited Utterance. A statement relating to a startling event or condition, made while the declarant was under the stress or excitement that it caused." We conclude that the trial court judge did not abuse his discretion in admitting Kiree's statement into evidence because the statement was equally admissible as either a present sense impression or an excited utterance.

**{29}** The elements of present sense impressions and excited utterances overlap considerably, with the most significant difference being the time lapse allowable between the event and the statement. Fed. R. Evid. 803(1)-(2) advisory committee's notes. Excited utterance and present sense impression differ in that "excited utterance requires a reasonable inference that emotional stress has contributed to the making of the statement, while present sense impression requires instead that the statement be substantially contemporaneous with the event it is describing or explaining." *State v. Flores,* 2010-NMSC-002, ¶ 52, 147 N.M. 542, 226 P.3d 641 (2010).

18

**{30}** The underlying theory in allowing a present sense impression exception to hearsay is that "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Id.* In order for a statement to be admissible under the present sense impression exception to the hearsay rule, the statement must be one that: "describes or explains the event or condition, and it must be made very close in time to the event that the statement describes. The judge must decide if the time element affects the statement's reliability and if there is any apparent motive to lie." *State v. Chavez*, 2008-NMSC-125, ¶ 9, 144 N.M. 849, 192 P.3d 1226 (citing *State v. Perry*, 95 N.M. 179, 180-81, 619 P.2d 855, 856-57 (Ct. App. 1980)). It is immaterial under the present sense impression exception to the hearsay rule that the declarant is unavailable to testify. *Id.*

**{31}** By comparison, the underlying theory to the excited utterance exception to the hearsay rule is that "the exciting event induced the declarant's surprise, shock, or nervous excitement which temporarily stills capacity for conscious fabrication and makes it unlikely that the speaker would relate other than the truth." *Telles*, 2011-NMCA-083, ¶ 9 (citing *State v. Macias*, 2009-NMSC-028, ¶ 30, 146 N.M. 378, 210 P.3d 804 (internal quotation marks and citation omitted)). This Court has noted that the meaning of "excited" is not restricted by "any narrow requirement of a frenzied or hyperactive state." *Flores*, 2010-NMSC-002, ¶ 48. The totality of the circumstances

19

is evaluated, including how much time elapsed between the startling event and the statement, and whether, during that time, "the declarant had an opportunity for reflection and fabrication; how much pain, confusion, nervousness, or emotional strife the declarant was experiencing at the time of the statement; whether the statement was self-serving; and whether the statement was made in response to an inquiry." *Telles*, 2011-NMCA-083, ¶ 9. Additionally, "the excited utterance doctrine [is] not so much limited in time as it [is limited] to the emotional state of the declarant when making the out-of-court declaration." *State v. Mares*, 112 N.M. 193, 201, 812 P.2d 1341, 1349 (Ct. App. 1991). The time sequence "continues as long as the declarant is under the stress and strain of the excitement caused by the event," and "admissibility depends more on circumstances than on time." *State v. Maestas*, 92 N.M. 135, 140, 584 P.2d 182, 187 (Ct. App. 1978).

{32} Based on the circumstances in this case, we conclude that the trial court judge exercised his discretion reasonably in allowing Kiree's statement into evidence under either a present sense impression or excited utterance exception to hearsay. The facts of the case demonstrate that gunshots rang out before the van crashed into the brick wall and that Parker and Kiree were among the first on the scene. They witnessed Payne in the process of exsanguination, and saw a female's dead body in the backseat of the van, all while people were screaming. Kiree's question posited to Parker ("Did

20

you see that person running?") satisfies the present sense impression exception to hearsay because it necessarily implies that the man had fled just moments before. Kiree had no discernible self-interest when he asked the question, and his question clearly described what he had just witnessed.

{33} Kiree's statement is likewise admissible under an excited utterance exception to hearsay. The unexpected gunshots and crash, coupled with the gory discovery of two bloody victims accompanied by screaming onlookers, created an atmosphere of panic and stress. The chaos following the crash was ongoing when Kiree asked Parker if he had seen a man running away, and it is unlikely that Kiree would have the ability to fabricate a lie under the circumstances. Thus, Kiree's question was admissible as either a present sense impression or excited utterance.

**E. THE TRIAL COURT'S IMPOSITION OF CONSECUTIVE LIFE SENTENCES DID NOT VIOLATE SEPARATION OF POWERS BY DIVESTING THE PAROLE BOARD OF ITS OBLIGATIONS**.

{34} Defendant argues that the trial court's imposition of consecutive life sentences violated the separation of powers doctrine because the Parole Board is the appropriate power to determine whether Defendant earned the right to parole after the first sentence ran. After Defendant was found guilty on all four counts, the State argued that the trial court should, in its discretion, run the two life sentences consecutively rather than concurrently. At the time of his sentencing, Defendant was a 24-year-old

21

male who had multiple run-ins with the law and a history of victimizing people, including aggravated battery on a police officer while he was in jail. While the Defense rejected the State's characterization of Defendant as remorseless, it also argued that the goal of rehabilitation would not be served with consecutive life sentences, since the impossibility of parole for good behavior takes away prisoners' incentive to better themselves. Nonetheless, the trial court ordered consecutive life sentences, and denied the Defendant's request for bond upon appeal.

{35} We review a trial court's sentencing for an abuse of discretion. *State v. Bonilla*, 2000-NMSC-037, ¶ 6, 130 N.M. 1, 15 P.3d 491. "The trial court has discretion to require [consecutive sentences]," unless otherwise proscribed by statute. *State v. Jensen*, 1998-NMCA-034, ¶ 21, 124 N.M. 726 (internal quotation marks and citation omitted).

{36} There is no statute which expressly prohibits the imposition of consecutive sentences for the crimes Defendant was found to have committed. Therefore it was well within the trial court's discretion to impose consecutive sentences on the Defendant. We see no facts in the record that would indicate that doing so was unreasonable. With respect to Defendant's argument that the Parole Board has been divested of its duty, we disagree. The Parole Board has not been removed from the process, Defendant's parole date, upon which the Parole Board will presumably serve

22

its function, has simply been set at a later time.

**F.  THERE WERE NO CUMULATIVE ERRORS THAT WERE SO PREJUDICIAL TO DEFENDANT THAT HE WAS DEPRIVED OF A FAIR TRIAL.**

{37}  Defendant contends he was prejudiced by commutative errors that deprived him of a fair trial.  He asserts the errors that occurred were: (1) the State repeatedly attempted to shift the burden of proof to Defendant by improperly asking witnesses whether Defendant had ever asked for additional lab testing on evidence; (2) the State acted unprofessionally in front of the jury by referring to defense counsel as a "criminal defense attorney," so as to imply that defense counsel was a criminal; (3) the State improperly remarked "this is getting ridiculous" when objecting to defense counsel's questioning of an expert witness; and (4) the State improperly asked Steven if Defendant ever told him that if he went to prison, he wanted it to be for murder. Recognizing that, individually, none of these instances provides grounds for reversal, Defendant asserts that in total they amount to prejudicial error that deprived him of a fair trial.

{38}  With respect to the first matter, Defendant contends there was error where the State improperly shifted the burden of proof by asking witnesses whether Defendant ever requested additional lab testing on certain evidence. During cross-examinations, defense counsel asked the State's expert witnesses whether additional testing was

23

done on hair samples and whether cadaver studies for .380 automatic weapons were conducted. When the State asked the witnesses on re-direct whether Defendant had requested such additional testing, defense counsel objected, stating Defendant had no obligation to prove the State's case.

{39} In addition to evidentiary burden shifting, Defendant alleges the State acted unprofessionally in front of the jury. The State repeatedly referred to defendant's counsel as a "criminal defense lawyer," implying to the jury that he was a criminal. The trial court advised both counsel to act professionally and move on.

{40} During the State's questioning of Steven, Steven said Defendant had never told him what he would want to go to prison for, contradicting his testimony in his deposition. When Steven said he did not recall whether Defendant ever said he wanted to go to prison for murder, defense counsel moved for a mistrial based on prosecutorial misconduct because the witness's answer was in the negative but the State continued asking leading questions. The trial court admonished the State that the record would reflect the witness's answer in the negative. Believing the damage was already done, defense counsel requested and received a curative jury instruction to disregard the last question asked. When the jury returned, the State asked Steven if Defendant was "proud" that his uncle went to prison for murder, and an objection was sustained.

24

{41} Finally, during the Defense's cross-examination of the State's expert witness on fingerprint analysis, defense counsel intimated that the witness's report was only as accurate as the reports given to her, and he asked, "You don't think that people are killed twice, do you?" The State objected, "This is getting ridiculous!" While the State admits that this outburst was inappropriate, the State argues it was an isolated incident.

{42} We find grounds for reversal "when the cumulative impact of errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Ashley*, 1997-NMSC-049, ¶ 21, 124 N.M. 1, 946 P.2d 205 (internal quotation marks and citation omitted). "We must consider whether, taken as a whole, the prosecutor's misconduct deprived defendant of a fair trial." *Id.* Based on the record before us, we do not agree that Defendant was deprived of a fair trial. The trial court is tasked with managing its court room, and where these instances occurred, the record reflects that it properly admonished the State and directed it to act professionally or otherwise properly instructed the jury to disregard the allegedly prejudicial statements. Defendant is correct that individually none of these instances amount to prejudicial error, but he fails to show how they cumulatively amounted to an unfair trial. The record reflects that the trial proceeded according to the rules and the law, Defendant had an opportunity to test the State's case, and he had a fair opportunity to put on his

25

own defense. In our view, there was no commutative error. Defendant had a fair trial.

## G. THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO SUPPORT DEFENDANT'S CONVICTIONS.

{43} Lastly, Defendant argues that the evidence at trial was insufficient to find him guilty of first degree murder and tampering with evidence. He asserts the State failed to establish any deliberation or premeditation with respect to the first degree murder conviction, and that the State failed to prove that Defendant tampered with evidence, where only one witness testified that she thought he had bloody clothing in a bag when he left Martinez's apartment. For these reasons, he asks that we reverse his convictions on both counts. We decline to do so.

{44} When asked to review the sufficiency of the evidence:

> [W]e view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Gallegos*, 2009-NMSC-017, ¶ 30, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citation omitted). Further, "[b]ecause [we] do[] not enjoy the same exposure to the evidence and witnesses as the jury at trial, our review for sufficiency of the evidence is deferential to the jury's findings." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057. "[We] will not invade the jury's

26

province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] [our] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted). Finally, "we review whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted).

{45}     The record reflects that there was direct or circumstantial evidence to support the jury's finding that Defendant was guilty of first degree murder and tampering with evidence. With respect to the former, there was direct evidence that Defendant was in Payne's van at the time of the murders, that a gun with his fingerprints on it was used to kill Payne and Ward, and that he exited the van and traveled to Martinez's apartment. Direct evidence also showed that Gary Payne's blood was found in that apartment, despite Martinez testifying that she did not know him, and that he had never been in her apartment. Both circumstantial and direct evidence support the jury's finding of premeditation or deliberation, where Payne and Defendant had a contentious relationship, Defendant went into Payne's van with a loaded handgun and both Payne and Ward were shot from behind with that handgun. Based on this evidence we uphold the jury's findings and affirm Defendant's first degree murder conviction.

{46} With respect to the tampering with evidence conviction, direct evidence supports the jury's logical inference that Defendant disposed of, or otherwise tampered with, the bloody clothes Martinez testified Defendant wore to her apartment on the night of the murder. Martinez testified that the next day, Defendant left her apartment with a bag, which contained clothes. Finally, she testified that she returned to her apartment after dropping Defendant off, cleaned the apartment and did not find any bloody clothing. Carrasco testified that when Defendant arrived (upon being dropped off by Martinez), he was not carrying anything and had no blood on his clothes. From this evidence, the jury could rationally have concluded that Defendant disposed of his bloody clothing. The bloody clothes were in Martinez's apartment while Defendant was there, he left the apartment with a bag, and the bloody clothes were never seen again. This evidence is sufficient for the jury to have made its determination, and we will not disturb its finding.

## III.   CONCLUSION

{47} The record reflects that Defendant had a fair trial, where evidence was produced that supports the jury's finding of guilt. Further, there was no error or prejudice sufficient to warrant reversing Defendant's convictions. Based on our findings above, we affirm all of Defendant's convictions.

{48}   **IT IS SO ORDERED.**

28

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Chief Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**