This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: January 16, 2020**

**NO. S-1-SC-37067**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOE DAVID CHAVEZ, SR.,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Jeffrey J. Buckels
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

**{1}**     Following a jury trial, Defendant was convicted of first-degree murder, conspiracy to commit first-degree murder, arson, and tampering with evidence. Defendant received a life sentence plus fifteen years in prison and appeals directly to this Court. *See* N.M. Const. Art. VI, sec. 2 (stating that appeals from a judgment of the district court imposing a life sentence shall be taken directly to the Supreme Court). Defendant contends that due to erroneous rulings of the district court, he is entitled to a new trial. Defendant also argues cumulative error entitles him to a new trial and that the evidence fails to support

the guilty verdicts. We disagree and affirm. Because existing precedent sufficiently addresses the questions raised by this case, we exercise our discretion under Rule 12-405 to dispose of this case by nonprecedential decision.

## I.        BACKGROUND

**{2}**        Police were dispatched to the scene of a car fire after a local resident called 911 to report that he observed flames while looking out his kitchen window. The resident testified that he first heard a loud car and when he looked out his window toward the direction of the sound of the loud car, he did not see anything. Then he heard "pops" and went to look out another window where he saw a car in flames. Upon arrival, police discovered the body of Richard Valdez (Victim), the boyfriend of Defendant's daughter, in a burning Suzuki station wagon. The police also found Matias Loza (Loza), who was crouching under a fifth-wheel and appeared to be nervous and sweating profusely. Loza kept saying "They're after me, they're chasing me." Loza told police that he was taken to the area "in a newer model four door purplish/blue Chevrolet pickup truck" by unknown assailants and feared for his life due to their conduct. Loza stated that he was able to get away but the assailants shot at Loza as he ran through the desert. An investigation of the crime scene revealed that the burning car was set on fire intentionally and forensic experts concluded Victim was killed by a gunshot wound to the back of the head.

**{3}**        Detective Fabian Picazo (Picazo) testified that he was advised to go to the hospital where Loza was in custody. Picazo asked Loza to give him everything he had and confiscated Loza's wallet, cell phone, and some miscellaneous papers. Police had already taken a lighter that was found on Loza at the scene of the car fire**.** Picazo testified about evidence recovered from Loza's cell phone, which included two "voice notes" or voice recordings (the "Loza recordings"). The first of these, Picazo stated, was the "hunt" recording which showed they were looking for Victim and the second was the "clean-up" recording which showed "they were preparing the body, how to dispose of it." The "clean-up recording" was played for the jury where Defendant was identified discussing "torching" the car. Picazo testified that Defendant was not on the "hunt" recording and there was nothing on that recording showing that Defendant gave any "instructions" to murder Victim or that Victim was a threat to the AZ Boys, a drug trafficking organization (DTO).

**{4}**        Approximately one week after the murder, Defendant was interviewed by police and denied knowing Loza. When police showed Defendant a photo of Victim, he was hesitant to answer and finally replied that Victim was his daughter's boyfriend. Police also asked Defendant about a 2006 Suzuki station wagon, which he admitted he had purchased for his daughter after more hesitation. A few days after that interview, police learned from an anonymous source that Defendant, his brother, and Loza had visited a strip club together. In addition, police obtained a group photograph that included Defendant and Loza, which was taken three weeks before Victim's murder.

**{5}** Six months after Victim's murder, Detective Preston Eldridge (Eldridge), who worked for the narcotics division and was familiar with the AZ Boys, testified that a search warrant was obtained to search Defendant's residence for evidence of money laundering, and that there was also an arrest warrant for Defendant because he had been charged with money laundering. Upon execution of the warrants, the police placed Defendant in custody and began searching the residence. Eldridge searched Defendant's bedroom and located evidence that could have been "related to another crime." Eldridge had all officers stop searching and vacate the residence until another search warrant could be obtained to search for "different evidence."

**{6}** Eldridge testified that he then took part in the second search of Defendant's residence. Eldridge found a set of keys belonging to a 2006 Suzuki, one pound of marijuana, approximately $30,000 in cash, and newspaper publications about the burning car where Victim was found. Eldridge testified that the search uncovered numerous receipts for various storage units, which led to a subsequent investigation where police located a purple GMC truck which was registered to Defendant.

**{7}** Norman Rhodes (Rhodes), a crime scene investigator, described a vacant residence where he was asked to search the living room for blood evidence. The vacant residence was identified as the previous residence of Defendant's brother, Robert (Bob). Rhodes testified that he took samples of suspected blood from the living room wall and the garage. Annette Ortiz (Ortiz), a forensic scientist specializing in DNA analysis, testified that she conducted a DNA analysis of Victim's blood and two swabs containing suspected blood from a "living room wall" and a "garage wall." Ortiz testified that the blood on both swabs was the blood of Victim "to a reasonable degree of scientific certainty."

**{8}** Police received additional information from confidential informants that Loza had admitted that he had murdered Victim and that he was an "enforcer" for the AZ Boys. Police also conducted an interview with Defendant's girlfriend, who stated that Defendant told her that they had killed Victim and left the body in a burning car. Using all the aforementioned information, police obtained a warrant for Defendant's arrest.

## II.    DISCUSSION

**{9}** Defendant raises six issues on appeal. Defendant first argues that the trial court erred in admitting "extensive uncharged misconduct evidence" on grounds that the State failed to adduce evidence linking the interests of the AZ Boys to the murder of Victim. Second, Defendant argues that the trial court erred in permitting the State to call an inmate, Jude Sanchez, to testify concerning a conversation that he had with Loza while they were incarcerated together, asserting that the State failed to establish Loza's unavailability. Third, Defendant argues the trial court erred in permitting Defendant's girlfriend, Tracy Garrison, to testify that Defendant was a "wife-beater," which was offered "in the absence of any non-propensity purpose to the evidence." Fourth, Defendant argues that the prosecution made "critical, misleading representations prior to trial" concerning a recording which listed Defendant on the coversheet of a transcript

that was meant to aid the jury, where Defendant was never actually a participant on the recording. Fifth, Defendant contends that these errors amounted to cumulative reversible error which deprived Defendant of a fair trial. Finally, Defendant asserts, "[a]lternatively, the Court should find that the State failed to bring substantial evidence of either a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction for [m]urder or [c]onspiracy, vacate the convictions, and remand with instructions to dismiss those charges with prejudice." We address each argument in turn.

## A. Whether the Trial Court Erred in Admitting "Uncharged Misconduct Evidence"

**{10}** Defendant argues that the trial court erred in admitting evidence concerning the AZ Boys against Defendant. Defendant specifically argues that the "evidence actually adduced at trial of a link between the interests of the DTO and the killing of [Victim] fell far short of the State's pretrial proffer, so that the trial court's admission of the 'association' evidence was based on a gross overestimate of the probative value of the DTO evidence, while its unfair prejudice to [Defendant] remained extreme." Defendant asserts that the "articulated non-propensity purpose of the DTO evidence was to show that [Victim] had become a security threat to the [DTO] and/or to its 'integrity'" which demonstrated Defendant's motive or intent to either direct or participate in the murder. Defendant contends that these representations did not turn out to be the evidence at trial.

**{11}** The State responds that the evidence was properly admitted to establish "that the members of the AZ Boys DTO, a criminal enterprise that was the sole source of income for Defendant, Loza and others, had a joint motive to kill [Victim] because he disrespected the DTO." The State argues that the evidence had great probative value because "it provides the 'causal link' between the DTO and the [Victim's] murder that Defendant asserts was missing." "Without such evidence, the jury would have no idea why Defendant wanted [Victim] dead; why he participated in the murder; or why Loza shot [Victim]." The State further contends that without the DTO evidence, the State's case would have been reduced to "a tale involving a series of bizarre, inexplicable violent acts with no apparent connection." Moreover, the State asserts that none of this evidence was impermissible propensity evidence, because "the issue was not whether Defendant's prior drug-dealing activities made it more likely that he was dealing drugs."

## 1. Standard of review

**{12}** "We examine the admission of evidence for abuse of discretion." *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Id.* (quotation marks omitted).

**2.    Analysis**

**{13}**    Prior to trial, the State filed a "notice of intent to introduce association evidence related to the AZ Boys DTO[.]" The notice showed that the State intended to introduce evidence that Defendant and his brother were head of a "loosely formed organization" known as the AZ Boys. The AZ Boys were considered a DTO, where Loza was an associate and enforcer for Defendant and his brother. The State intended to show the murder of Victim was to protect the integrity of the DTO and personal reputations of both Defendant and his brother, which was consistent with "11-404(B) to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence iof [sic] mistake, and lack of accident."

**{14}**    In response to the notice, Defendant filed a motion to strike. The motion to strike stated that Defendant believed the State intended to introduce evidence that Defendant was a drug dealer, which was not admissible to prove character. The motion asked the trial court to strike the notice and "require the state to give notice of what statements of prior crimes, wrongs or acts they intend to offer and the purpose prior to trial." The trial court denied Defendant's motion to strike, finding that the State's notice was "sufficiently specific; [t]hat for the purposes of propensity, the new crimes charged are not drug dealing crimes; [a] shared motive, plan, and intent are articulable theories."

**{15}**    Defendant again challenged the admissibility of this evidence in a [second] motion in limine. In that motion, Defendant asserted that the "[t]estimony that [Defendant] was in prison or a member of the AZ [B]oys or a drug dealer would not be relevant and would be prejudicial." Defendant argued that he was already convicted and sentenced for crimes related to his involvement with the AZ Boys and that even if the evidence was relevant, the prejudice would outweigh the probative value and would only tend show Defendant's disposition or propensity to commit crime.

**{16}**    In response to Defendant's [second] motion in limine, the trial court issued a minute order. In the minute order, the court provided that the State's theory of the case was that "[Victim], a *de facto* family member of Defendant, created a risk of public exposure to Defendant's drug trafficking organization and his subsequent murder by the organization's 'enforcer' was at the direction and for the benefit of its leaders, Defendant and his brother." The minute order identified, and Defendant specifically challenges, six evidentiary links the State claimed the evidence would show between the DTO and the murder of Victim.

1.    That Victim was a consumer of controlled substances supplied by the AZ Boys.

2.    That Victim presented a substantial security risk to the DTO.

3.    That security risk was demonstrated personally to Defendant.

4. That Defendant was on recordings which placed Defendant in conversations with his brother, Loza, and others on the day before Victim's murder.

5. That the murder was committed by Loza, who worked as an "enforcer" or "hit man" for the AZ Boys.

6. That Defendant personally participated in an attempt to conceal the murder.

**{17}** At trial, the State called Tracy Garrison (Garrison), Jude Sanchez (Sanchez), and Angel Gonzales (Gonzales) to testify. Garrison, who testified that she had been in a relationship with Defendant for five or six years, was the State's principal witness. Garrison had been charged with money laundering and racketeering as a result of putting several vehicles in her name at the direction of Defendant and was testifying pursuant to a plea agreement. Garrison testified that she met Defendant while he was living across the street from her mother in Arizona. Defendant and his brother, Bob, ran a drug business in Arizona. Defendant kept drugs, money, and jewelry in the home Garrison and Defendant shared in Alamogordo, NM. Garrison testified Defendant had no other occupation or employment outside of drug dealing.

**{18}** Garrison was with Defendant and Bob when she met Loza for the first time. Garrison testified that Bob and Loza "hung out together" and that she only saw Loza when he was with Bob. Garrison knew Loza as "Mighty Mouse." Garrison went on to describe an incident that Defendant told her occurred at Applebee's, where Loza and Victim began arguing. Loza grabbed a dull steak knife from the table when Defendant asked them to take the argument outside.

**{19}** After the incident at Applebee's, Garrison received a phone call from Victim who had an urgent tone. Victim asked Garrison not to tell Defendant that he had called, but she did so anyway. Defendant said he would "be there in a minute" and told her to lock the door and not to open it. After returning from Applebee's, Defendant told Garrison about the incident but never mentioned why it occurred. Garrison understood "somebody disrespected somebody."

**{20}** Garrison testified that the next time she had a conversation with Defendant was in the Applebee's parking lot. Defendant, who arrived in a purple GMC truck, got out and into the passenger seat of Garrison's vehicle. Defendant proceeded to tell Garrison "We killed [Victim]." Defendant told Garrison that Victim arrived at Bob's house and started apologizing and then "they" grabbed him. Victim was "squirming like a fish out of water" and he almost got away, so they grabbed him again. Victim kept fighting and "Mighty" shot Victim in the back of the head Defendant thought he had been shot because a piece of bone hit Defendant in the neck. Garrison next testified that Defendant told her they had left Victim's body in the trunk of a car, which was in the garage at Bob's house. Defendant also told her "we burned the car" and once it went up in flames, Loza asked "What, am I next or am I not?"

**{21}**    Sanchez, an inmate who was incarcerated with Loza, was also called to testify. Sanchez testified that Loza referred to himself as "AZ." Loza told Sanchez he was down from Arizona to sell drugs with two friends "Joe and Bob" and that his job was to be an "enforcer." Loza also told Sanchez that he was incarcerated for "setting a guy on fire inside a car." Sanchez testified that Loza said "they ran Alamogordo and the drug gang" and was "basically bragging about all this stuff." When asked whether Loza made any other statements about Defendant, Sanchez testified "Yeah, they just hung out. They were good friends, real close, you know?"

**{22}**    The State proceeded to ask Sanchez whether Loza actually told Sanchez that he had shot Victim. Sanchez responded "Yes, he told me that it was Joe's [Defendant] daughter's boyfriend. He never said his name." Sanchez testified that Loza said he was at a house in a room and Defendant brought Victim into the room where they were smoking dope and Loza shot him. Sanchez testified that, after the shooting, Loza said they wrapped Victim up, put him in the trunk and drove to Old El Paso highway with Defendant following Loza in another vehicle. As Loza was driving, he started "tripping out" and "wasn't driving right" so Defendant turned around and left him. Loza ended up parking the car and setting it on fire. When Defendant asked Sanchez in cross-examination whether he had ever heard Loza say there was a plan to kill Victim, Sanchez responded that they already had the gas in the car and "everything ready." Sanchez testified that Loza and Defendant were the only ones present and mistakenly stated that Victim had been shot at Defendant's house.

**{23}**    Gonzales, an Applebee's employee, testified that she knew Defendant because he came to the restaurant about two times a month. Defendant told Gonzales that he and his brother had come from Arizona to flip houses. Gonzales stated that the "AZ Boys" was a name she had given the group because they came to Applebee's frequently and Gonzales did not "really call them by their names." Gonzales testified that she knew they were from Arizona, and it "just kind of came out one day, I was like 'Oh, there's the AZ Boys.'" Gonzales then stated that she had gone out to a strip club with Defendant where she observed around $10,000 to $15,000 being spent. Gonzales also testified about a Halloween party where Bob and Loza showed up uninvited. When Gonzales asked them to leave, they got very upset. Gonzales testified that Loza felt disrespected and threatened to kill everyone in the house, even asking Bob "You want me to do it? Just tell me to do it. I'll kill everyone in here."

**{24}**    After the State rested its case, Defendant moved for a directed verdict on the murder charge, "point[ing] out that the State has not established a time of death and they have proven that he died, proven that he died prior to the fire in the car." Defendant argued that the State only presented two witnesses who testified that Defendant had any involvement. These were Garrison who testified that Defendant held Victim while Loza shot him, and Sanchez, who testified that that the murder occurred at Defendant's home where Loza shot Victim out of nowhere. Defendant asserted that the only evidence that Defendant participated in the murder was the testimony of Garrison, who had been impeached through other testimony. Defendant specifically challenged Garrison's testimony, alleging that the State "got her to change" her testimony that

Defendant said "we killed [Victim]," when she had made prior statements to police that Defendant said "they killed [Victim]."

**{25}** As to the conspiracy charge, Defendant argued there was no evidence of an agreement, where there must be proof of knowledge of a conspiracy, a common design, an intent to agree and an intent to commit the offense. Defendant contended that neither Garrison nor Sanchez testified to an agreement to kill Victim. Defendant also argued that the State failed to show how the murder was linked to an incident involving drugs and a threat to the DTO. Rather, Defendant argued that what was shown was that Bob and Loza would travel together and when things would upset them, they would either threaten to kill people or kill someone. Ultimately, Defendant asserted there was no involvement, no indication of knowledge by Defendant, and no indication that Defendant joined in a common design. Defendant conceded that there was sufficient evidence to go forward on the tampering charge but continued to challenge the arson charge because the only evidence presented at trial was that Loza set the car on fire on his own.

**{26}** In response, the State argued that Garrison's testimony showed that Defendant was present when Victim was murdered and assisted in burning the body. Rebutting Defendant's assertion that Loza just shot Victim out of nowhere, the State argued that Sanchez's testimony showed that Defendant "brought him [Victim] in" to the room where he was murdered. The evidence that Victim was shot in the back of the head was corroborated by forensic scientists and a "Loza recording" which referenced shooting someone in the forehead or the back of the head and showed a shared motive. The State argued that the "Loza recordings" showed a timeline that Victim was alive when "they were looking for him." The State also referenced the "Loza recordings" where Defendant was identified saying Victim was "leaking" which showed an "immediacy to the killing." The State then summarized additional evidence to support Defendant's murder charge, including the Suzuki key found at Defendant's residence, the purple GMC truck, and testimony that a "loud car" left the area of the fire. As to conspiracy, the State argued that Garrison's testimony that Defendant confessed "certainly show[ed] a shared motive between Bob and Loza. The State next referenced the fact that none of "these individuals" had employment which demonstrated a hierarchy where money was obtained by trafficking drugs. The State argued that Garrison's testimony that Defendant was the supplier and kept drugs and money at their home showed a "higher order on the pecking level" that was specifically demonstrated by Gonzales' testimony that the AZ Boys spent a large sum of money at the strip club. The State also argued that the testimony, which demonstrated the control of at least 14 vehicles that were used for the purposes of the DTO, showed the "resources to corroborate their leadership" and was further corroborated by Sanchez's testimony that Joe and Bob, the AZ Boys, ran Alamogordo.

**{27}** With respect to arson, the State argued it was "still using the prism of accessory liability," stating that there were references to Defendant in the "clean-up" recording by use of a torch and "throwing [Victim] into the car showing his culpability and intention in destroying that vehicle." As to tampering, the State argued that tampering would apply

to the destruction of Victim's body. The State therefore urged the trial court to deny Defendant's motion for directed verdict on all counts.

**{28}** The trial court, which viewed the evidence in the light most favorable to the State, found there was "not ground for directed verdict on any of the counts." The trial court stated that, in reference to the murder charge, the time of death could be reasonably inferred as "taking place after the gunshot wound to the head and before the body was dragged to the garage, certainly before the car was burned with the body inside." The trial court also stated "We have the Sanchez testimony that the Defendant brought the Victim into the room, we have the Garrison testimony that Defendant said that he held the Victim while Loza shot him." The trial court found there was "sufficient evidence that a reasonable jury could find beyond a reasonable doubt on count one [murder] and the jury should resolve disputed issues of fact." As to conspiracy, the trial court ruled:

> There is evidence where the jury could infer that the Defendant and Bob Chavez were principals in the AZ Boys, a drug-trafficking organization; that the killing of their victims served the purposes of the AZ Boys; that Loza was subject to at least Bob's direction regarding use of violence; that Loza and Bob and Joey [Defendant's son] planned the killing; that the Defendant was brought to Bob's house and if you believe Jude Sanchez, and the jury can or cannot, that he was actually brought to the house by the Defendant – in any event the Defendant was present, the Defendant assisted in holding the Victim while Loza shot him in the head and that the Defendant thereafter helped conceal the body. All that is more than enough to allow a reasonable jury to find beyond a reasonable doubt conspiracy to commit murder.

With respect to arson, the trial court stated that the accessory liability theory could be relied on by the jury because there was evidence that Defendant was part of a discussion about burning the car, there was evidence that Defendant may have followed Loza to the scene, and also evidence that gas cans "were ready." As to tampering, the trial court stated that the direct evidence that Defendant was involved in the destruction of the body after the killing was sufficient to go to the jury.

**{29}** After the trial court denied Defendant's motion for directed verdict, Defendant asked to move on to his "cumulative error argument for mistrial." As Defendant began arguing that the State had not proven the elements of conspiracy, the trial court interrupted Defendant and stated that Defendant's argument sounded like another argument for directed verdict, not an argument for cumulative error. Defendant briefly discussed that the statements of a co-conspirator were inadmissible without any additional evidence of a conspiracy and proceeded to his next argument, challenging a "typo" that included Defendant's name on the coversheet of a transcript to be used as an aid while the "Loza recordings" were played to the jury. Defendant argued that the State "was intending to use that until during the trial when identification of the speakers became important, they let us know that as a matter of fact, he wasn't present and that's not his voice." Defendant contended that the murder was not based on drug

transactions or the AZ Boys, but based on Bob and Loza who become upset with people and consider killing them. Defendant asserted there was no evidence that Victim was a threat and had to be eliminated. Defendant renewed his objections to the "404(B) evidence" which included testimony that Defendant was violent towards Garrison and evidence of money laundering, racketeering, and drug trafficking, arguing that it became a major portion of the evidence presented and was more prejudicial than probative.

**{30}**     As to conspiracy, the State responded that Defendant's argument "further illustrates and exemplifies that the defense doesn't understand the import of the conspiracy outside the recordings." With regard to the transcript, the State argued that Defendant had the recording for which the transcript was created for "years." The State also noted that Defendant "infused and injected" Defendant's prior criminal convictions into this case, where Defendant, on cross-examination, asked Picazo if he was aware that Defendant was arrested, convicted, and sentenced to 46 years in prison for drug trafficking, money laundering, and racketeering.

**{31}**     Defendant then called the trial court's attention to the minute order which provided that the State could "show that Defendant told another witness that [Victim] created a public scene in a local restaurant demanding drugs and money from the Defendant and his brother[.]" Defendant argued that Garrison's testimony was "someone got disrespected[,]" which had nothing to do with drugs and money. Defendant argued that the "evidence to place Defendant in conversations with his brother, Robert, Loza and others the day before [Victim's] murder" was not presented although the State originally told the trial court this would be proven through the recording of a conversation that Defendant did not participate in but was exculpatory evidence that should have been disclosed to Defendant. Defendant stated that the trial court ruled to allow "all this 404(B) evidence" because the State told the trial court it was going to present evidence which "made it seem like the killing was related to Arizona Boy business when that's not what happened." The trial court's response was the following:

> I think it's perfectly appropriate for the defense to argue that representations relied upon in the minute order did not turn out to be the same as the trial evidence with regard to the Defendant's involvement or non-involvement at the Applebee's incident and with that regard, to Defendant's involvement or non-involvement in the conversation during what the State's referred to as the "hunt" for [Victim]. The representations before trial did not turn out to be the evidence introduced at trial and that's a matter of record. [Defense Counsel] goes from that and other arguments to say that the 404(B) evidence should never have come in at trial and that's where I differ from him and think there is still a basis for the 404 evidence. There is still an articulable theory supported by the evidence and the jury is the ultimate determiner of what are the facts and they can choose to rely upon or not rely upon anything that I discuss in this analysis, but I am required to look at this in the light most favorable to the State now. But there is evidence in the record that a reasonable jury could

rely upon to infer that this killing was motivated by the joint intent of the leadership of the Arizona Boys which is primarily the Defendant and his brother, Bob, to protect the interests of the Arizona Boys. [Defense Counsel] mentions in passing that while there were changes in what was the anticipated evidence, that made it seem less strong on behalf of the State. The change from what was said before trial, that Ms. Garrison would testify that the Defendant said "they" had killed [Victim], which could be interpreted as meaning including him or not including him, Ms. Garrison testified at trial that "we" had killed [Victim], which the statement includes him. As to the deletion of the Defendant as a participant in the conversations during the "hunt," that deletion at trial actually aids the defense, primarily, I believe. And I'd also note that the defense's argument of the impact [inaudible] that they were unable to prepare to cross-examine assumes that their only obligation is to accept what the State says about their evidence and not do their own investigation, not even review that recording with their own client to see if it appears accurate. They didn't do that and I can't attribute that to the State.

**{32}** Rule 11-401 NMRA provides that relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence[.]" However, relevant evidence may be excluded under Rule 11-403 NMRA if its probative value is substantially outweighed by unfair prejudice. "Evidence is unfairly prejudicial if it is best characterized as sensational or shocking, provoking anger, inflaming passions, or arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." *State v. Bailey*, 2015-NMCA-102, ¶ 20, 357 P.3d 423 (internal quotation marks omitted). "The determination of unfair prejudice is fact sensitive and, accordingly, much leeway is given [to] trial judges who must fairly weigh probative value against probable dangers." *Id.* (citing *State v. Otto*, 2007-NMSC-012, ¶ 14, 141 N.M. 443, 157 P.3d 8) (internal quotation marks omitted). "The fact that competent evidence may tend to prejudice a defendant is not grounds in and of itself for exclusion of that evidence." *State v. Garcia*, 1983-NMSC-008, ¶ 20, 99 N.M. 771, 157 P.3d 8.

**{33}** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Rule 11-404(B)(1) NMRA. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 11-404(B)(2) NMRA. "This list is not exhaustive and evidence of other wrongs may be admissible on alternative relevant bases so long as it is not admitted to prove conformity with character." *Otto*, 2007-NMSC-012, ¶ 10 (internal quotation marks omitted).

**{34}** "The trial court has a duty to excise evidence of uncharged acts if it can be done without destroying the relevancy of the evidence which addresses the charges, defenses, or issues. However, if the evidence is so intertwined, the trial court may allow the evidence." *Garcia*, 1983-NMSC-008, ¶ 20 (citation omitted).

**{35}** In *Garcia*, the State sought to introduce evidence that the defendant was a member of the prison gang "Los Carnales." *Id.* ¶¶ 10, 11. The defendant filed a motion in limine to prohibit "any mention" of "Los Carnales" but the trial court denied the motion and allowed the admission of the evidence to show motive. *Id.* ¶ 10. The State called an inmate to testify that the defendant told him that the victim had embarrassed the defendant and that "I am going to show him that 'Los Carnales' are here to stay, we're going to run this place." *Id.* ¶ 11. The defendant argued that the testimony concerning "Los Carnales" was so prejudicial that it deprived him of a fair trial. *Id.* ¶ 16.

**{36}** We concluded that the testimony regarding "Los Carnales" was "so intertwined with a possible motive" for the murder that the trial court could not have excised it. *Id.* ¶ 21. In doing so, we relied on *United States v. Lucero*, 601 F.2d 1147 (10th Cir. 1979), where the defendant was charged with "transporting forged securities in interstate commerce." *See id.* ¶ 20. In *Lucero*, the trial court admitted into evidence tape recorded conversations of the defendant referring to "narcotics transactions" as well as a "forgery operation." *Lucero*, 601 F.2d at 1148. The defendant argued that admission of these recordings "constituted impermissible evidence of unrelated crimes." *Id.* The court determined "the discussion of drug transactions was so intertwined with the money order discussion that it could not reasonably have been excised." *Id.* at 1149.

**{37}** This is not materially different. The AZ Boys evidence established there was a motive to conspire to kill Victim. The evidence was not to show character or propensity of Defendant in his participation in the AZ Boys, but to show why Defendant and his co-conspirators wanted Victim killed. As in *Garcia*, the evidence regarding the AZ Boys was so intertwined with a motive to kill Victim that the trial court could not have excised it. The trial court acknowledged "the representations before trial did not turn out to the evidence introduced at trial and that's matter of record" but that there was still an "articulable theory supported by the evidence."

**{38}** The State's evidence showed that Victim came to an Applebee's that Defendant and Loza frequented and began arguing with Loza. Defendant told Garrison about the incident and she understood "somebody disrespected somebody." Garrison also testified that Defendant had beaten her on two separate occasions for drawing attention to his drug dealing activities. The AZ Boys evidence supplies the motive as to why Defendant and the other AZ Boys wanted Victim killed: Victim drew attention to Defendant and his co-conspirators who were involved in a DTO and disrespected members of the DTO publicly at Applebee's. The State articulated this theory both before and during trial and while it may not have established every evidentiary link provided by the minute order, the DTO 404(B) evidence supported an articulable theory as to motive. The probative value of the evidence substantially outweighed any unfair prejudice and the trial court did not abuse its discretion in the admission of the DTO evidence regarding the AZ Boys.

**B. Whether the Trial Court Erred in Permitting Jude Sanchez to Testify Due to the State's Failure to Establish Loza's Unavailability**

**{39}** Defendant argues that the jury should have never heard the testimony of Sanchez because the State failed to establish Loza's unavailability under Rule 11-804(B)(3) as a statement against interest. Defendant bases this argument on the fact that Loza's attorney was a "contract attorney who had been assigned to his case and who did not know where Loza was and had never spoken to him." Defendant contends that the Fifth Amendment privilege is a right that was Loza's to invoke and that Loza's "lawyer was his lawyer, not a guardian acting *in loco parentis.*" Defendant specifically takes issue with the trial court's reasoning, where Defendant contends that the trial court found it "logical" for Loza to invoke the Fifth Amendment privilege under these circumstances. Defendant also argues that the trial court erred in permitting Loza's attorney to invoke attorney-client privilege when Defendant proceeded to inquire as to what Loza's attorney relied on to support her invocation of Loza's Fifth Amendment privilege. Defendant asserts that "[f]undamental fairness requires a party to elect between claiming privilege or asserting a claim to which privileged matters are material and relevant[,]" citing to *See Westheimer v. Tennant*, 831 S.W.2d 880, 883 (Tex.App. 1992).

**{40}** The State responds that Defendant offers no reason why Loza's attorney could not assert his Fifth Amendment privilege on his behalf in reliance on communications with Loza's previous counsel. The State also argues that Defendant has not cited any authority that would have overridden the assertion of attorney-client privilege to disclose the contents of the "files."

### 1.     Standard of review

**{41}** Admission of evidence under an exception to the hearsay rule is reviewed for an abuse of discretion. *State v. Benavidez*, 1999-NMSC-041, ¶ 4, 128 N.M. 261, 992 P.2d 274. The appropriate inquiry for an admission of a statement against penal interest under Rule 11-804(B)(3) is whether the trial court's ruling constitutes an abuse of discretion. *Id.*

### 2.     Analysis

**{42}** At trial, the State called Sanchez to testify. Defendant asked to approach and explained that the State had not yet met the burden of establishing that Loza was unavailable. The State responded that Loza's attorney sent a letter to defense counsel explaining that Loza did not want to testify and did not wish to be transported for Defendant's trial. Defendant responded that the letter was not signed or notarized and that Defendant had "a right to see if he's going to testify or for him to invoke his privilege." The trial court asked Defendant whether he doubted the authenticity of the letter, and if it was a "real issue" whether Loza would testify. Defendant again questioned the letter and the fact that it had not been signed and when the trial court asked Defendant whether he doubted the authenticity of the letter, Defendant replied "yes." The trial court then told the State they would have to call Loza's attorney as a witness.

**{43}** Loza's attorney, Stefanie Gulley (Gulley), appeared by telephone. Gulley testified that she was a contract public defender who represented Loza in a different criminal case involving the murder of Victim. When Gulley was asked where Loza was located, she stated that she believed he was in county detention, but did not know which facility he was in. Gulley testified that she received a communication from the State inquiring as to whether Loza would testify in Defendant's trial and advised the State that Loza was invoking his privilege against self-incrimination and did not want to be transported for the upcoming trial.

**{44}** On cross-examination, Defendant asked Gulley when she told Loza that he was a witness in Defendant's case. Gulley replied that she believed it had been conveyed by the previous attorney on the case but she did not know. Defendant proceeded to ask Gulley whether she had ever asked Loza if he wanted to testify in Defendant's trial. Gulley stated that she did not personally ask him but as his attorney representing him in a pending criminal case, that she would assert Loza's fifth amendment privilege against self-incrimination. Defendant asked Gulley "Isn't that privilege his personal privilege?" and Gulley responded "Yes, it is." Defendant then asked "You don't know whether he would invoke the privilege, you're only testifying that you would invoke the privilege?" to which Gulley replied "Yes." When Defendant asked Gulley if she had ever met the client, she answered "not yet, no." Defendant finally asked "So he is not asserting a privilege?" and Gulley replied "I would be asserting it on his behalf."

**{45}** On re-direct, Gulley testified she was relying on the files of Loza's prior counsel in her representation of Loza. On re-cross, Defendant inquired as to what in the file indicated that Loza was notified of the trial and asked whether he wished to invoke his privilege. At that point, Gulley stated that "I think that goes into attorney-client privilege and work product and all of that." As Defendant continued to ask about these files, the State objected and the trial court stated that it would honor the assertion of attorney-client privilege on the client's behalf.

**{46}** After Gulley was excused, the trial court asked if it was necessary to have argument as to whether Loza was "unavailable" to testify. The State asked the court to take judicial notice of Loza's pending murder trial and give appropriate weight to Gulley's representation of Loza. Defendant argued that Loza himself was required to assert the privilege to which the trial court responded "An attorney can assert a client – a privilege on behalf of a client." Defendant replied "Not if they've never met the client and have no idea what the client wants to do." The trial court stated that it was unaware of that impediment against self-incrimination under these circumstances, which would be testimony that Loza confessed to Victim's murder and a relationship with the AZ Boys, subject to "racketeering responsibility and conspiracy responsibility." The trial court then stated that "I can't imagine a circumstance wherein an attorney would advise a client that they should go ahead and testify to that without some kind of extraordinary circumstances being shown." Defendant continued to argue that Gulley had never met Loza, even after she had been notified Loza was listed on the witness list in Defendant's trial. The court acknowledged Defendant's point and stated:

It's a point well taken, but in the absence of meeting with the client, an assertion of a privilege against self-incrimination under these circumstances appears reasonable and the court will honor it. So under 11-804(A), New Mexico Rules Annotated, Subsection 1, I will find that unavailability of Matias Loza exists because Matias Loza is exempted from testifying about the subject matter of his statement because a privilege applies, that being a privilege under State and Federal Constitutions.

**{47}** Defendant does not cite to any authority holding that a successor attorney is not allowed to assert the Fifth Amendment on behalf of a client based on notes made by a prior attorney in the client's file. *See State v. Lovett*, 2012-NMSC-036, ¶ 46, 286 P.3d 265 (assuming that where arguments in brief have no supporting authority, that counsel was unable to find any supporting authority, after a diligent search). We therefore conclude that the district court did not abuse its discretion in finding that Loza was unavailable because he had a Fifth Amendment privilege not to testify due to the criminal charges which were pending against him.

**C.      Whether the Trial Court Erred in Permitting Defendant's Girlfriend to Testify That Defendant Was a "Wife-Beater"**

**{48}** Defendant argues that it was error for the trial court to permit Garrison to testify that Defendant "had beaten her, breaking her ribs, early in their relationship." Defendant contends that the testimony was that Defendant "did this to her because she was making a scene." Defendant asserts that there was no other testimony "concerning this incident, the reason for it, or the consequences of it" and the testimony "assuredly" made Defendant look like a "wife-beater." Defendant argues admission of this evidence was an abuse of discretion and/or plain error which deprived Defendant of his right to a fair trial. Defendant asserts that this error was preserved by way of his second motion in limine but while there are several instances of testimony listed, the testimony of Garrison concerning the evidence complained of is not provided in the motion. Defendant did not object to this testimony while Garrison testified, but later renewed his objection to the 404(B) evidence, including the testimony that Defendant was violent towards Garrison.

**{49}** The State responds that Garrison's testimony was admissible because the testimony was in response to the question of whether Garrison had ever drawn attention to Defendant's drug dealing. The State contends that this evidence reinforces Defendant's sensitivity to the exposure of his drug dealing operation, which further helped explain the motive for Victim's murder to the jury.

**1.      Standard of review**

**{50}** "Again, the appellate courts review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v.*

*Maxwell*, 2016 NMCA-082, ¶ 21, 384 P.3d 116 (citing *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72) (internal quotation marks omitted).

**2. Analysis**

**{51}** At trial, the State asked Garrison "Have you ever, whether it was purposeful or not, drawn attention to Joe's [Defendant] drug dealing?" Garrison responded "Yes" and when the State asked Garrison to elaborate, she explained "the first time was when I very first got with him and then I left and I was walking down the street and he kept telling me to get in the truck, and that was, like, the first time he really ever, like, hurt me, like really bad. And he broke my ribs and I couldn't stand up for, like, all the way up for, like, a month." When the State asked Garrison why he did that to her, she stated "He said I was causing a scene." Garrison testified that there was another time when she found Defendant at Motel 8 and began banging on the door loudly. Defendant told Garrison to leave so she went home and Defendant beat her up "because he had dope on him."

**{52}** Defendant fails to include in his brief, and the State points out, that Garrison offered this testimony in response to the State's question as to whether Garrison had drawn attention to Defendant's drug dealing and what the outcome was. This testimony demonstrated that Defendant imposed consequences when attention was drawn to him, even if the attention was not the result of a drug transaction itself. This evidence supported Defendant's motive to kill Victim who had drawn attention to Defendant at Applebee's during Victim's argument with Loza. For the same reasons provided in support of the admission of the 404(B) evidence, we reject Defendant's arguments under this point.

**D.    Whether the Prosecution Made Critical, Misleading Representations Prior to Trial Concerning the Nature of the "Loza Recordings"**

**{53}** Defendant argues that the State made misrepresentations that Defendant was a participant in the "hunt" recording by listing Defendant on the cover sheet of a transcript meant to aid the jury at trial. Defendant contends that when it came time to play the recording at trial, it became clear there would be no evidence that Defendant participated in the recorded conversation. Defendant argues that the "late discovery of the true contents" of the "planning" of Victim's murder on the recording misled the defense and affected trial strategy. Defendant asserts that if the defense had known no one was claiming Defendant was part of the "planning," it would have "dramatically strengthened its response to and the judge's weighing and handling of the prosecution proffer of uncharged misconduct evidence, the DTO association evidence."

**{54}** The State responds that there was "no prosecutorial misconduct" with respect to the "Loza recordings." The State contends that Defendant's impression that Defendant would be on the "planning" recording was due to a typographical error that was corrected before the jury read the transcript. The State notes that Defendant raised this issue in a post-trial "motion for sanctions for prosecutorial misconduct and mistrial[,]

which the trial court denied, finding "no evidence that the State's lawyer purposely misled Defendant's counsel" and that Defendant had "suffered no prejudice[.]"

## 1. Standard of review

**{55}** "We review a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (citing *State v. Fry*, 2006-NMSC-001, ¶ 52, 138 N.M. 700, 126 P.3d 516) (quotation marks omitted). "An abuse of discretion exists when the trial court acted in an obviously erroneous, arbitrary, or unwanted manner." *Id.* (alteration omitted) (quotation marks omitted).

## 2. Analysis

**{56}** Before trial, the trial court issued a minute order providing that "[t]he State intends to introduce recordings which, according to the State, place Defendant in conversations with his brother Robert, Loza, and others on the day before [Victim's] murder[.]" At trial, the State admitted two recordings, the "Loza recordings," and was also permitted to provide the jury with two transcripts to aid the jury while listening to the recordings. Prior to playing the recordings for the jury, the trial court offered the following cautionary instruction:

> The court has admitted two transcripts for the limited and secondary purpose of aiding you in following the content of the statements and conversations as contained in the recordings. The two transcripts also have the secondary purpose of aiding you in identifying the speakers. However, you are the sole judges as to whether the transcripts correctly or incorrectly reflect the content of the statements, conversations, and identities of the speakers. It is entirely for you to determine the accuracy of the transcripts. You should judge the accuracy of the transcripts based upon your own evaluation of the testimony you have heard concerning the reliability of the transcripts and from your own examination of the transcripts in relation to your hearing of the recordings. The recordings themselves are the primary evidence of their contents. The identification of the speakers of the transcripts are the assertions of the State in preparation of the transcripts. If you should determine that the transcripts or the identifications are in any respect incorrect or unreliable, you should disregard that portion and make your own determination of the content or identification. If there is a conflict between the transcripts and your review of the recordings, the recordings control.

**{57}** Defendant argues that the State gave the "impression" that Defendant was on the recording by listing Defendant on the cover sheet of the transcript for the recording. Defendant asserts that "[B]y the time came for the playing of the recording for the jury, it had become clear that there was and would be no evidence that [Defendant] was a participant in this conversation."

**{58}**   At trial, the State called the certified court reporter who prepared the transcript in question. When Defendant asked why Defendant was listed as a participant on the transcript cover sheet although he had not been identified on the recording, the court reporter replied "It should say Joey. It's a mistype. It's Joey." The court reporter also acknowledged that Defendant should be removed from the cover page of the transcript and that Defendant did not speak on the recording that she transcribed. The State amended the transcript by removing Defendant's name prior to being shown to the jury.

**{59}**   Defendant filed a post-trial motion for "sanctions for prosecutorial misconduct and mistrial." Defendant's motion asserted that the State intentionally created the transcript coversheet to make it appear as if Defendant participated in the conspiracy conversation, or the "hunt" recording. Defendant contended "the District Attorney, either intentionally or with gross recklessness, misrepresented the 'conspiracy recording' to murder [Victim] involved [Defendant] and this representation was not supported by the recorded evidence." The trial court concluded that Defendant suffered no prejudice because Defendant "had the recording for months prior to trial and should have known he was not present and that he could rebut any assertion that it was his voice on the recording."

**{60}**   Defendant argues that the State's misrepresentation misled the court and defense counsel but there is no evidence that the typographical error made on the transcript was intentional. Moreover, Defendant cites no authority to support his position as to why an inadvertent mistake constitutes legal error warranting reversal. This Court does not review unclear or undeveloped arguments and this Court may further assume that no authority exists. *See State v. Guerra*, 2012-NMSC-014, ¶ 28, 278 P.3d 1031 (citations omitted).

### E.   Whether Cumulative Error Warrants a New Trial

**{61}**   Defendant argues that the foregoing errors cumulatively warrant reversal of his convictions and a new trial. However, we have concluded there was no error, which precludes application of the cumulative error doctrine. *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (noting that there is no cumulative error where there is no error).

### F.   Sufficiency of the Evidence

**{62}**   Although Defendant does not argue the sufficiency of the evidence as a separate point, we address it.

> When reviewing a jury's verdict for sufficient evidence, this Court determines whether substantial evidence, either direct or circumstantial, exists to support every element essential to a conviction beyond a reasonable doubt. Evidence is viewed in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. This Court will not second-guess the

jury's decision concerning the credibility of witnesses, reweigh the evidence, or substitute its judgment for that of the jury. So long as a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction, this Court will not upset a jury's conclusions.

*State v. Ramirez*, 2018-NMSC-003, ¶ 6, 409 P.3d 902 (brackets omitted) (internal quotation marks and citations omitted).

**{63}** The evidence we have set forth herein, which we do not repeat here, is more than sufficient to support the guilty verdicts rendered by the jury under our standard of review.

## III. CONCLUSION

**{64}** We affirm the judgment and sentence.

**{65} IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**